HENRY N. AND MARILYN HULTER, PETITIONERS *v.*
COMMISSIONER OF INTERNAL REVENUE,
RESPONDENT

DAVID AND ILSEROSE BRYAN, PETITIONERS *v.*
COMMISSIONER OF INTERNAL REVENUE,
RESPONDENT

Docket Nos. 3969-81, 23116-81,    Filed August 29, 1988.
36790-84, 40130-84.

*Shlomo Aaron Beilis, Donald J. Pols,* and *James J.
Mahon,* for the petitioners.

*Pamela V. Gibson, Albert A. Balboni, Marvis Knospe,
Robert J. Foley,* and *Robert B. Dugan,* for the respondent.

SWIFT, *Judge:* In timely statutory notices of deficiency,
respondent determined deficiencies in petitioners' Federal
income tax liabilities as follows:

PETITIONERS HENRY N. AND MARILYN HULTER

| Year | Docket No. | Deficiency |
|------|------------|------------|
| 1974 | 23116-81 | $158.00 |
| 1975 | 3969-81 | 10,931.00 |
| 1976 | 3969-81 | 22,142.00 |
| 1977 | 3969-81 | 89,739.00 |
| 1978 | 23116-81 | 31,136.00 |
| 1979 | 36790-84 | 92,081.00 |

PETITIONERS DAVID AND ILSEROSE BRYAN

| Year | Docket No. | Deficiency |
|------|------------|------------|
| 1975 | 40130-84 | $13,179.00 |
| 1976 | 40130-84 | 15,711.83 |
| 1977 | 40130-84 | 16,034.77 |
| 1978 | 40130-84 | 12,510.34 |
| 1979 | 40130-84 | 28,577.63 |

These consolidated cases are test cases for investors who were denied deductions for partnership losses relating to their investments in Tudor Associates, Ltd., II. By agreement of the parties, issues not relating to Tudor II were severed prior to trial. The issues for decision at this time are: (1) Whether, and if so when, a sale occurred to Tudor II of real property located in North Carolina; (2) whether a purported $24.5 million nonrecourse debt obligation of Tudor II relating to the sale represented a genuine debt obligation; and (3) whether activities of Tudor II with respect to the acquisition and management of real property constituted an activity engaged in for profit.

## FINDINGS OF FACT

Many facts have been stipulated and are found accordingly. Petitioners Henry N. and Marilyn Hulter are husband and wife and resided in Greenbrae, California, at the time their petition was filed. Petitioners David and Ilserose Bryan are husband and wife and resided in Locust Valley, New York, at the time their petition was filed. Petitioners timely filed joint Federal income tax returns for the years in issue.

### Tudor II

The Federal income tax deficiencies in dispute relate to partnership losses arising from petitioners' investments in a real estate limited partnership, Tudor Associates, Ltd., II (hereinafter referred to as Tudor II). Tudor II was organized on December 30, 1975, as a Nebraska limited partnership by Boston attorneys George Osserman (Osserman) and Paul Garfinkle (Garfinkle). The limited partnership agreement filed on behalf of Tudor II named Zan D. Galloway, Osserman's girlfriend, as sole general partner of Tudor II. No limited partners were identified in the partnership agreement.

The principal place of business of Tudor II was located at One Gateway Center, Newton, Massachusetts, and the stated purpose of Tudor II was to invest in and manage real property. Tudor II was one of 12 tax-oriented limited partnerships that Osserman and Garfinkle organized in the

mid 1970's, in each of which Ms. Galloway was the designated general partner. As general partner of Tudor II, Ms. Galloway performed few duties. She essentially was a front or straw person for Osserman.

The professed investment objectives of Osserman and Garfinkle and of corporations and real estate investment partnerships they organized and promoted were to purchase commercial real property that due to poor management and operations had become depressed in value and that could be purchased with favorable, nonrecourse financing. After purchase by a closely held corporation controlled by Osserman and Garfinkle at a price allegedly determined by a multiple of five times potential annual gross rental income, the property would be resold to one of the limited partnerships Osserman and Garfinkle had formed at a price allegedly determined by a multiple of eight times potential annual gross rental income.

Theoretically, negative cash-flow in the years immediately following purchase of property would be covered by additional investor funds contributed to the partnership. By improving management of the property, the value and operating income from the property would increase significantly. Operating income was to be used to service the large, nonrecourse debt incurred to purchase the property from Osserman and Garfinkle's controlled corporation. In theory, investing limited partners eventually would receive substantial profits from the partnership's ownership of the real property. In the interim, until the property became profitable, limited partners would receive substantial tax benefits associated with the debt-financed purchase of the property.

OCG Enterprises, Inc. (OCG), the corporate vehicle used to purchase the real property in the first instance, was a Massachusetts corporation formed by Osserman and Garfinkle in 1970, with its principal place of business also at One Gateway Center in Newton, Massachusetts. Osserman and Garfinkle were the chief operating officers of OCG and indirectly controlled its stock.

In early 1975, Osserman negotiated on behalf of OCG for the purchase of real property located in Atlanta, Georgia,

owned by a real estate broker named Jud Kusaba (hereinafter referred to as the Kusaba property). It was Osserman's apparent intent that the Kusaba property, after purchase by OCG, would be transferred to Tudor II. Osserman made projections of income, losses, and tax benefits with respect to the Kusaba property and included the projections in private placement memoranda with respect to Tudor II. The purchase, however, by OCG of the Kusaba property was never consummated.

During late 1975, investments in Tudor II were solicited through private placement memoranda. Investors were offered partnership units that could be purchased for $55,000 each. Fractional units also could be purchased. One hundred units were to be sold, resulting in a projected total capitalization for Tudor II of $5.5 million. Under the subscription agreements, each investor was to pay the $55,000 as follows: $10,000 cash in the first year and the balance of $45,000 in annual contributions of $7,500 over the next 6 years. The investors, however, were not obligated to make the annual contributions in years two through seven. The only penalty for failure to pay the optional $7,500 annual contributions was a forfeiture by the investors of a pro rata share of their interests in the partnership.

As stated, financial projections of income and losses relating to the specific characteristics and financial history of the Kusaba property were set forth in offering memoranda given to prospective investors, but the Kusaba property was not identified as the basis for the projections. In two subsequent offering memoranda, also relating to Tudor II, some of the real property purportedly acquired by Tudor II was specifically identified. The financial projections set forth in each offering memoranda, however, were based solely on the Kusaba property. No financial projections relating specifically to the properties that were purportedly acquired by Tudor II were set forth in the offering memoranda.

Osserman and Garfinkle, or their agents, were successful in subscribing all 100 limited partnership units in Tudor II. A number of units in Tudor II were received by limited partners in exchange for services rendered to the partnership. For example, Ms. Galloway received one unit for her

agreement to be general partner, and Tudor II's accountant received one unit for accounting services. Osserman and Garfinkle also were limited partners of Tudor II, but the record does not disclose how they paid for their units.

Petitioners Henry N. and Marilyn Hulter acquired a fractional interest in Tudor II. They executed an undated subscription agreement with Tudor II and in connection with that agreement, gave a $3,000 personal check to Tudor II dated December 29, 1975. The Hulters also gave $5,000 to Tudor II in each of the years 1976, 1977, and 1978, representing total partnership contributions by the Hulters during the years in issue of $18,000.

Petitioners David and Ilserose Bryan also acquired a fractional interest in Tudor II. They executed a subscription agreement and issued a $5,000 check to Tudor II, both dated December 31, 1975. The Bryans paid $3,750 to Tudor II in each of the years 1976 and 1977, and $3,850 in 1978, representing total partnership contributions by the Bryans during the years in issue of $16,350.

## Acquisition by OCG of Real Property in North Carolina

In December 1975, OCG retained William L. McDonald (McDonald) to investigate certain real property located in Durham, North Carolina. At that time, the property to be investigated was owned by C. Paul Roberts (Roberts), a Durham contractor, or by corporations controlled by Roberts. McDonald inspected several of Roberts' apartment buildings and motels which were threatened with foreclosure. Although McDonald had no authority to enter into contracts to purchase property on behalf of OCG, he and Roberts allegedly came to an understanding that OCG would acquire from Roberts or from his corporations two large apartment complexes named "Yorktowne Apartments" (Yorktowne)[1] and "British Woods Apartments" (British Woods), two motels named "Duke Motor Lodge" and "Sleepy Time Inn," eight small apartment buildings referred to as "the Budget properties,"[2] and six other

---

[1]The interest to be acquired in Yorktowne was a leasehold interest.

[2]The eight Budget properties were named "Arrowhead Apartments," "Governor Apartments," "Trinity North Apartments," "310 Trinity Apartments," "Executive Apartments," "Burton School Apartments," "Alpine I Apartments," and "Imperial Apartments."

properties. Pursuant to Osserman and Garfinkle's purported investment objectives, as outlined above, after acquiring ownership of the 18 properties, OCG intended to transfer the properties to Tudor II or to one of the other limited partnerships being promoted by Osserman and Garfinkle.

On McDonald's recommendation that OCG purchase the Durham properties, negotiations continued with Roberts during the last few days of 1975 over the purchase price and financing terms. The price offered Roberts for all 18 properties allegedly was determined using the formula described above and used by Osserman in buying other properties. The annual gross rental income from all of the properties was estimated as if all of the properties were fully occupied. That figure was multiplied by five to determine the total purchase price offered. McDonald on behalf of OCG offered to purchase the 18 properties for $17.3 million from Roberts and his corporations.

Roberts allegedly agreed to the $17.3 million purchase price. The properties were to be acquired subject to existing mortgages with respect to which Roberts and his corporations would remain primarily liable. After subtracting balances due on existing mortgages, the balance of the total purchase price was to be reflected by a nonrecourse promissory note to be issued by OCG in favor of Roberts and his corporations. As indicated below, prior to consummation, this proposed transaction was modified in a number of respects.

### Acquisition of Yorktowne and British Woods by OCG and by Tudor II

Although transfer of all 18 of the properties to be transferred to OCG by Roberts was not possible by the end of 1975, a decision was made to carve out and to attempt to transfer to OCG the two largest properties (namely, Yorktowne and British Woods) by December 31, 1975, and to transfer the other 16 properties in 1976. Roberts agreed to convey Yorktowne and British Woods to OCG for $9,260,000, separately from the other properties.[3] These apartment buildings were owned respectively by Yorktowne

---

[3]The stated purchase price reflected a price of $3,475,000 for Yorktowne and $5,785,000 for British Woods.

Apartments, Inc., and British Woods Two Apartments, Inc., two of Roberts' controlled corporations.

On December 31, 1975, apparently in order to facilitate transfer of title in Yorktowne and British Woods from Roberts' corporations to OCG and then to Tudor II, a North Carolina limited partnership, OCG-York-Woods, Ltd., was formed. The general partners of OCG-York-Woods were Yorktowne Apartments, Inc., and British Woods Two Apartments, Inc., each of which held a 1-percent interest in the partnership. The sole limited partner of OCG-York-Woods was OCG, which held a 98-percent interest in the partnership. In return for its partnership interest, Yorktowne Apartments, Inc., by agreement dated December 31, 1975, assigned its leasehold interest in Yorktowne to OCG-York-Woods.[4] In return for its interest in the OCG-York-Woods partnership, British Woods Two Apartments, Inc., by bill of sale dated December 31, 1975, transferred its interest in British Woods to the partnership.

OCG agreed to pay $250,000 to the partnership in return for the 98-percent limited partnership interest it received. Neither OCG nor the OCG-York-Woods partnership gave Roberts a promissory note reflecting the balance of the stated purchase price. On December 31, 1975, OCG bypassed payment of the $250,000 to OCG-York-Woods and paid the $250,000 directly to Roberts. Also on December 31, 1975, OCG assigned its 98-percent limited partnership interest in OCG-York-Woods to Tudor II by written agreement dated December 31, 1975.

Petitioners argue that as a result of the above transaction, as of December 31, 1975, Tudor II acquired a 98-percent partnership interest in OCG-York-Woods, which partnership acquired the leasehold interest in Yorktowne and the fee interest in British Woods. Petitioners argue that as a result of Tudor II's 98-percent interest in the OCG-York-Woods limited partnership, as of December 31, 1975, Tudor II, for tax purposes, should be regarded as owner of the leasehold interest in Yorktowne and the fee interest in British Woods.

---

[4]Yorktowne Apartments, Inc., also executed a bill of sale signed by Roberts on Dec. 31, 1975, transferring to OCG-York-Woods all personal property located at Yorktowne.

On January 13, 1976, representatives of OCG, Tudor II, and Roberts' corporations met in Durham, North Carolina, in order to execute further documents to transfer from OCG-York-Woods to Tudor II the leasehold interest in Yorktowne and the fee interest in British Woods. Yorktowne Apartments, Inc., and British Woods Two Apartments, Inc., assigned to Tudor II their respective 1-percent interests in the partnership, and OCG-York-Woods executed in favor of Tudor II bills of sale with respect to the personal property located at Yorktowne and British Woods. The OCG-York-Woods partnership was dissolved, allegedly leaving Tudor II with ownership of the leasehold interest in Yorktowne and the fee interest in British Woods.

Tudor II received its interests in Yorktowne and British Woods subject to the outstanding mortgage obligations of Roberts' corporations with respect to these properties in the total amount of $7,570,377.15. In addition, Tudor II executed two nonrecourse promissory notes—one in the amount of $590,869.09 in favor of Yorktowne Apartments, Inc., secured by a deed of trust on Yorktowne, and a second promissory note in the amount of $848,753.76 in favor of British Woods Two Apartments, Inc., secured by a deed of trust on British Woods. These amounts, combined with the $250,000 in cash OCG gave to Roberts on December 31, 1975, reflect the $9,260,000 purchase price for Yorktowne and British Woods that was agreed to on December 31, 1975. The total principal amount of each promissory note was due in one payment on January 13, 1983. Interest on each note at 8 percent per annum was due for the first year in one payment on January 13, 1977. Thereafter, interest was due in quarterly installments beginning April 13, 1977. Each note was signed on January 13, 1976, by Ms. Galloway in her capacity as general partner of Tudor II, and the deeds of trust were recorded on the same day with the Durham County Registry of Deeds.

### $24.5 Million Promissory Note of Tudor II to OCG

Allegedly, on January 13, 1976, Tudor II executed in favor of OCG a $24.5 million nonrecourse promissory note. The note was dated "as of January 3, 1975," and purported to be a restatement of a promissory note in the same

amount executed on January 3, 1975, by Tudor II in favor of OCG. The $24.5 million promissory note purported to constitute total consideration for all 18 of the North Carolina properties that were to be purchased from Roberts or Roberts' corporations. The terms of the $24.5 million promissory note called for payment by Tudor II of interest only during 1975 at an annual rate of 13 percent, of interest only during 1976 at an annual rate of 9 percent, and thereafter equal monthly payments of principal and interest at 9 percent, so as to fully liquidate the debt at the end of 30 years. The $24.5 million promissory note was signed by Ms. Galloway in her capacity as general partner of Tudor II.

The Tudor II $24.5 million nonrecourse promissory note was secured by a purchase money mortgage in favor of OCG on the Yorktowne and British Woods properties, and on 11 other properties.[5] The promissory note provided that if operating revenues from the properties which secured the note proved insufficient to meet monthly debt service thereon, unpaid interest would be added to principal and would not accrue further interest.

The purchase money mortgage executed by Tudor II in favor of OCG is what generally is regarded as a wraparound mortgage.[6] Roberts or his corporations remained liable on the outstanding mortgages on the properties. OCG also was to remain nominally liable on its nonrecourse indebtedness to Roberts and to Roberts' corporations with respect to the $17.3 million purchase price OCG had agreed to pay for the North Carolina properties.

The principal amount of the $24.5 million nonrecourse promissory note was determined allegedly using the same projections of annual gross rental income from the proper-

---

[5]The properties listed in the purchase money mortgage which secured the Tudor II $24.5 million promissory note were Yorktowne, British Woods, Duke Motor Lodge, Sleepy Time Inn, the eight Budget properties, and a motel property, Captain's Bridge Resort Inn, which was located in Atlantic Beach, North Carolina, and which will be discussed *infra.*

[6]A wraparound mortgage has been described as follows:

"In a conventional acquisition the seller of a property pays off the mortgage at the time of the closing so that the buyer receives clear title. The buyer then places his or her own mortgage on the property. The wraparound mortgage is an exception to this approach. Instead of being paid off, the old mortgage is left in place, and a new, larger mortgage is placed on the property. Payments on the new mortgage are used first to make payments on the old mortgage, and any excess is then applied to paying down the new mortgage. [S. Jarchow, Real Estate Syndication, sec. 15.4(b), at 437 (1985).]"

ties that had been used for determining the $17.3 million purchase price to which OCG had agreed. Instead of using a multiple of five, however, the price for the purchase of the properties by Tudor II was determined using a multiple of eight. The explanation for using a higher multiple in determining the price Tudor II was to pay for the property was that the fair market value of the property supported the higher price and that OCG was entitled to receive more for the properties than it had agreed to pay in order to compensate it for putting the transaction together.

The purchase money mortgage securing the $24.5 million nonrecourse promissory note was not recorded in the Durham County Registry of Deeds until February 16, 1978.

### $2.5 Million Loan from Cayman Islands National Bank

Petitioners also contend that on December 31, 1975, a $2.5 million loan was received from Cayman Islands National Bank. The $2.5 million loan allegedly was obtained on Tudor II's behalf, and the loan proceeds allegedly were used to pay interest that had accrued on Tudor II's $24.5 million promissory note to OCG from January 5, 1975, through December 31, 1975, because Tudor II, as of December 31, 1975, did not have income or sufficient investor contributions to make the interest payment due. The evidence concerning the $2.5 million loan is superficial and suspect. Inadequate documentation has been offered to verify the existence of this loan or to establish that any such loan proceeds were received by or on behalf of Tudor II.

### Purchase by OCG of Duke Motor Lodge, Sleepy Time Inn, the Eight Budget Properties, and Captain's Bridge Resort Inn

The $24.5 million promissory note, dated as of January 3, 1975, purported to constitute consideration for Tudor II's purchase from OCG of Yorktowne, British Woods, Duke Motor Lodge, Sleepy Time Inn, the Budget properties, Captain's Bridge, and six other properties. As of January 13, 1976, however, neither Tudor II nor OCG had executed any documents to reflect the purchase of any properties other than Yorktowne and British Woods.

Not until January 30, 1976, did Roberts or his corporations execute in favor of OCG deeds to Duke Motor Lodge, Sleepy Time Inn, and the eight Budget properties. The deeds of conveyance to OCG were subject to existing mortgage obligations of Roberts and his corporations with respect to those properties. On January 30, 1976, and March 15, 1976, OCG paid Roberts cash of $75,000 and $90,000, respectively.

On March 17, 1976, OCG and Roberts executed a sales agreement under which OCG agreed to a total purchase price of $8,040,000 for all of the properties in Durham, North Carolina, that OCG was to purchase from Roberts and Roberts' corporations, excluding Yorktowne and British Woods, but including six properties that petitioners concede were never transferred to Tudor II. The March 17, 1976, agreement states that it constitutes a redrafting of an earlier written agreement allegedly made in January of 1975 between OCG and Roberts with respect to the properties. The agreement states that the original January 1975 sales agreement was destroyed in a fire in the office of Roberts' attorney. The evidence, however, indicates that no fire in the attorney's office occurred and that no sales agreement, written or oral, existed between Roberts and OCG with respect to any of the properties until late December of 1975, at the earliest.

By deed dated April 1, 1976, OCG allegedly acquired from East Federal Savings & Loan Association of Kinston, North Carolina, the Captain's Bridge Resort Inn located in Atlantic Beach, North Carolina. The stated purchase price for Captain's Bridge was $1.2 million, reflected by three nonrecourse promissory notes executed by OCG in favor of East Federal.

On May 31, 1976, deeds of conveyance were executed by OCG in favor of Tudor II with respect to Duke Motor Lodge, Sleepy Time Inn, and the eight Budget properties. These deeds were recorded in the Durham County Registry of Deeds on December 31, 1976.

On January 5, 1977, a deed of conveyance was executed by OCG in favor of Tudor II with respect to Captain's Bridge. The deed stated that the transfer was effective "as

of April 2, 1976." The deed was recorded in the appropriate county land records on January 6, 1977.

In summary, Tudor II eventually acquired nominal legal title to 13 properties (or leasehold interests therein), all located in North Carolina (namely, Yorktowne, British Woods, Duke Motor Lodge, Sleepy Time Inn, the eight Budget properties, and Captain's Bridge). The $24.5 million nonrecourse promissory note Tudor II gave OCG purportedly constituted consideration for all 13 properties. The stated purchase price OCG agreed to pay Roberts for these properties was approximately $15,625,000.[7]

## Management of North Carolina Properties

Between January and July of 1976, Roberts continued to manage all of the above-described North Carolina properties, except Captain's Bridge, under a written employment contract with Tudor II. Roberts was to continue to collect rental income from the properties and to pay all operating expenses, including costs of utilities, taxes, and casualty and liability insurance on the properties. Under Roberts' management, the properties remained unprofitable. The evidence before us is not conclusive, but it appears that some rental proceeds from the properties were misappropriated, that Roberts allowed friends to reside in some of the units rent-free, that he followed a policy of racial discrimina-

---

[7]As is apparent, the record relating to the price OCG agreed to pay Roberts for the properties is not completely clear. We compute the total purchase price agreed to by OCG for the properties as follows:

| | | |
|---|---|---|
| Yorktowne and British Woods | | |
| Cash | $250,000.00 | |
| Mortgage obligations assumed | 7,570,377.15 | |
| Tudor II notes | 1,439,622.85 | |
| Subtotal | | $9,260,000 |
| Duke Motor Lodge, Sleepy Time Inn, and eight Budget properties | | |
| Cash | 165,000.00 | |
| Mortgage obligations assumed | [1]5,000,000.00 | |
| Subtotal | | 5,165,000 |
| Three mortgage notes re: Captain's Bridge | | 1,200,000 |
| Total | | 15,625,000 |

[1]As explained, the stated purchase price of $8,040,000 set forth in the Mar. 17, 1976, agreement included six properties that were never transferred to Tudor II. For purposes of the instant computation and lacking a better figure from the parties, we have allocated $3,040,000 of the stated purchase price to those six properties and have subtracted that amount from the $8,040,000 to derive a total estimated price of $5 million (plus the $165,000 in cash) for Duke Motor Lodge, Sleepy Time Inn, and the eight Budget properties.

tion in renting the properties, and that he did not provide adequate maintenance for the properties, all of which contributed to the continuing failure of the properties to earn any profits.

In July of 1976, Osserman fired Roberts as manager of the properties and one of Roberts' former employees was hired as manager of the properties. During the second half of 1976, the high rate of vacancies did not diminish, and losses realized on the subject properties did not decrease.

In August of 1976, Roberts was indicted and pled guilty to Federal criminal charges pertaining to the receipt of loan proceeds in excess of Federal limits from a Durham savings and loan association during the years 1972 through 1975. After Roberts' employment was terminated, Roberts failed to make the underlying mortgage payments on some of the North Carolina properties that had been sold to OCG and to Tudor II with respect to which he remained liable, and the credit institutions holding the mortgages initiated foreclosure proceedings.

### Bankruptcy Proceedings

On January 6, 1977, a chapter 12 bankruptcy petition was filed on behalf of Tudor II in the U.S. District Court for the Eastern District of North Carolina. During the bankruptcy proceeding, Tudor II exercised control over the subject properties as debtor-in-possession. It fired the second manager and hired a third manager, Pete Parsons, who made several improvements.[8]

All of the properties were disposed of during the course of the bankruptcy proceeding, with the exception of Captain's Bridge, which was sold in a separate foreclosure proceeding on June 28, 1977, for $1,050,000. Three of the Budget properties were sold at public auction on November 22, 1977, for $103,000, and the remaining five Budget properties underwent foreclosure during 1978 and 1979.

Pursuant to an order of the bankruptcy court dated December 7, 1979, the four largest properties (namely, Yorktowne, British Woods, Duke Motor Lodge, and Sleepy

---

[8]Parsons evicted tenants who had been allowed to reside rent-free in the apartments. He discontinued racial discrimination in leasing apartments, and he performed maintenance and repairs on the properties.

Time Inn) were sold for $19,850,000. Also, pursuant to a December 7, 1979, order of the bankruptcy court, Tudor II's total outstanding indebtedness (determined by the court to be $28,543,000) was reduced to $19,850,000 reflecting the sales price of the four properties.[9]

### Books and Financial Records of Tudor II

The books and financial records of Tudor II generally were maintained under the accrual method of accounting by employees of OCG and Tudor II in Newton, Massachusetts. Funds from Tudor II routinely were commingled in the bank accounts and financial records of the various partnerships with funds from other limited partnerships formed by Osserman and Garfinkle. In addition, operating funds and capital accounts of the various limited partnerships often were confused.

During the bankruptcy proceeding, a list was submitted to the bankruptcy court of annual operating expenses of each of the properties allegedly owned by Tudor II. The parties herein agree, for purposes of this case, that that list reflects an accurate accounting of the operating expenses of Tudor II for the years 1976 through 1980.

### Other Matters

In 1982, Osserman and Garfinkle were indicted in the U.S. District Court for the District of Massachusetts. Each pled guilty to knowingly aiding and assisting in the preparation of fraudulent individual income tax returns in violation of section 7206(2),[10] and of willfully conspiring to devise a scheme to defraud the Internal Revenue Service by means of false representations, in violation of 18 U.S.C. section 371. These criminal charges related to a limited partnership organized by Osserman and Garfinkle in order to finance oil and gas exploration activities.

---

[9]At some relevant point prior to June 11, 1976 (when Tudor II filed its Federal partnership return), petitioners allege that OCG and Tudor II informally agreed to reduce the principal amount of Tudor II's liability on the wraparound mortgage from $24.5 million to $20,780,000 in order to compensate for OCG's failure to convey to Tudor II all 18 properties referred to in the wraparound mortgage. In the bankruptcy proceeding in 1977, however, Tudor II claimed the full amount of the $24.5 million note to OCG as an outstanding partnership indebtedness.

[10]Unless otherwise indicated, all section references are to the Internal Revenue Code of 1954 as amended and as in effect during the years in issue.

Tudor II did not timely file Federal partnership tax returns (Forms 1065) for 1975, 1976, or 1977. Tudor II filed two untimely Forms 1065 for 1975, three untimely Forms 1065 for 1976, and it did not file a partnership return for 1977.

The income and deductions reported by Tudor II on its Federal partnership tax returns which gave rise to the partnership losses claimed by the various partners were as shown on page 386. [11]

Included in the income and deductions for 1975 and 1976, as reported on the Forms 1065 filed on behalf of Tudor II and as listed above, were the income and expenses with respect to Lakewood Apartments, which was owned by Roberts and which was located in Durham, North Carolina. Lakewood Apartments, however, was not acquired by either OCG or Tudor II, apparently because Roberts lost the property to foreclosure before it could be conveyed to OCG. The income and expenses reported with respect to Lakewood Apartments on Tudor II's 1975 and 1976 partnership returns are as follows:

| Lakewood Apartments | 1975 | 1976 | Total |
|---|---|---|---|
| Rental income | $77,810 | $49,741 | $127,551 |
| Deductions: | | | |
| Depreciation | (60,693) | (36,457) | (97,150) |
| Repairs | (2,406) | (2,429) | (4,835) |
| Other expense | (36,158) | (89,113) | (125,271) |
| Net loss | (21,447) | (78,258) | (99,705) |

Petitioners claimed their distributive share of Tudor II's reported losses as follows:

HENRY N. AND MARILYN HULTER

| Year | Partnership loss |
|---|---|
| 1975 | $12,048 |
| 1976 | 21,644 |
| 1977 | 20,472 |
| 1978 | 19,840 |
| 1979 | 11,596 |
| Total | 85,600 |

---

[11]The figures for 1975 are taken from the Form 1065 filed on June 19, 1976. The figures for 1976 are taken from the Form 1065 filed on Aug. 4, 1977. The figures for 1977 are taken from the Form 1065 prepared by accountants for Tudor II, but not filed with the Commissioner. The figures for 1978 and 1979 were based on Tudor II's ownership of four properties, namely, Yorktowne, British Woods, Duke Motor Lodge, and Sleepy Time Inn.

| | 1975 | 1976 | 1977 | 1978 | 1979 | Total |
|---|---|---|---|---|---|---|
| *Income* | | | | | | |
| Rents | $1,684,799 | $2,249,287 | $2,135,633 | $2,160,806 | $1,526,125 | $9,756,650 |
| Other income | - - - | 16,518 | 3,110 | - - - | 33,691 | 53,309 |
| Total income | 1,684,799 | 2,265,805 | 2,138,733 | 2,160,806 | 1,559,816 | 9,809,959 |
| *Deductions* | | | | | | |
| Interest | 3,430,000 | 2,136,175 | 2,128,345 | 2,114,926 | 1,421,129 | 11,230,575 |
| Depreciation | 1,127,297 | 1,897,967 | 1,799,223 | 1,623,469 | 1,067,896 | 7,515,852 |
| Operating expense | 749,131 | 579,997 | 1,046,501 | 1,007,393 | 883,021 | 4,266,043 |
| Commissions | 150,000 | - - - | - - - | 27,060 | 55,945 | 233,005 |
| Professional fees | 45,000 | - - - | 7,597 | 76,409 | 11,768 | 140,774 |
| Repairs | 21,920 | 88,768 | - - - | 43,332 | 93,992 | 248,012 |
| Taxes | 219,633 | 355,755 | 197,002 | 197,215 | 98,613 | 1,068,218 |
| Other | - - - | 277,695 | 61,978 | 77,000 | - - - | 416,673 |
| Total deductions | 5,742,981 | 5,336,357 | 5,240,646 | 5,166,804 | 3,632,364 | 25,119,152 |
| Net losses | (4,058,182) | (3,070,552) | (3,101,913) | (3,005,998) | (2,072,548) | (15,309,193) |

DAVID AND ILSEROSE BRYAN

| Year | Partnership loss |
|------|-----------------|
| 1975 | $20,088 |
| 1976 | 16,234 |
| 1977 | 15,355 |
| 1978 | 14,880 |
| 1979 | 10,435 |
| Total | 76,992 |

At the trial of this case in Boston, Massachusetts, expert testimony was heard regarding the fair market value of the 13 properties acquired by Tudor II. The experts are in substantial agreement that the total fair market value of the 13 properties in January of 1976 was between $14 million and $15 million.

OPINION

*Sale of the North Carolina Properties*

The first issue for decision is whether, and if so when, the 13 North Carolina properties were sold to Tudor II, or whether the sale of the properties to Tudor II, for Federal income tax purposes, was a sham. Petitioners argue that the sale of 12 of the properties (not including Captain's Bridge) occurred on December 31, 1975, when Roberts initially agreed to convey the properties to OCG. In the alternative, petitioners contend that the sale to Tudor II occurred no later than the dates the deeds were executed by OCG conveying each of the properties to Tudor II.

Respondent argues that, for Federal income tax purposes, the purported sale to Tudor II should not be recognized and that the transactions by which Tudor II purported to acquire the 13 properties from OCG were without economic substance and were shams. In the alternative, respondent argues that if Tudor II did acquire ownership of the properties, transfer of ownership to Tudor II did not occur any earlier than the dates the deeds reflecting the transfers were recorded.

It is established that the economic substance of a transaction purporting to be a sale, not its form, governs for Federal income tax purposes. In *Frank Lyon Co. v. United States*, 435 U.S. 561 (1978), the Supreme Court summarized the principles underlying this doctrine as follows:

This Court, almost 50 years ago, observed that "taxation is not so much concerned with the refinements of title as it is with actual command over the property taxed—the actual benefit for which the tax is paid." *Corliss v. Bowers,* 281 U.S. 376, 378 (1930). In a number of cases, the Court has refused to permit the transfer of formal legal title to shift the incidence of taxation attributable to ownership of property where the transferor continues to retain significant control over the property transferred. E.g., *Commissioner of Internal Revenue v. Sunnen,* 333 U.S. 591 (1948); *Helvering v. Clifford,* 309 U.S. 331 (1940). In applying this doctrine of substance over form, the Court has looked to the objective economic realities of a transaction rather than to the particular form the parties employed. The Court has never regarded "the simple expedient of drawing up papers," *Commissioner of Internal Revenue v. Tower,* 327 U.S. 280, 291 (1946), as controlling for tax purposes when the objective economic realities are to the contrary. "In the field of taxation, administrators of the laws and the courts are concerned with substance and realities, and formal written documents are not rigidly binding." *Helvering v. Lazarus & Co.,* 308 U.S., at 255. See also *Commissioner of Internal Revenue v. P.G. Lake, Inc.,* 356 U.S. 260, 266-267 (1958); *Commissioner of Internal Revenue v. Court Holding Co.,* 324 U.S. 331, 334 (1945). Nor is the parties' desire to achieve a particular tax result necessarily relevant. *Commissioner of Internal Revenue v. Duberstein,* 363 U.S. 278, 286 (1960). [435 U.S. at 572-573.]

It has been stated repeatedly that to be recognized for tax purposes a transaction must have a purpose and substance apart from anticipated tax consequences. *Knetsch v. Commissioner,* 364 U.S. 361, 365-370 (1960); *Goldstein v. Commissioner,* 364 F.2d 734, 740 (2d Cir. 1966), affg. 44 T.C. 284 (1965); *Elliott v. Commissioner,* 90 T.C. 960, 970 (1988).

In order to constitute a sale or transfer of ownership for Federal income tax purposes, the benefits and burdens of ownership must pass from the seller to the buyer. Whether a sale has occurred is a question of fact that must be ascertained from the intentions of the parties as evidenced by the written agreements and by all of the relevant facts and circumstances. *Reinberg v. Commissioner,* 90 T.C. 116, 132 (1988); *Durkin v. Commissioner,* 87 T.C. 1329, 1367 (1986); *Grodt & McKay Realty, Inc. v. Commissioner,* 77 T.C. 1221, 1237 (1981). In *Grodt & McKay Realty,* we identified some of the factors that are considered in determining whether a transaction is to be recognized as a sale or as a transfer of ownership of property:

The term "sale" is given its ordinary meaning for Federal income tax purposes and is generally defined as a transfer of property for money or

a promise to pay money. The key to deciding whether petitioners' transactions * * * are sales is to determine whether the benefits and burdens of ownership have passed * * * . Some of the factors which have been considered by courts in making this determination are: (1) Whether legal title passes; (2) how the parties treat the transactions; (3) whether an equity was acquired in the property; (4) whether the contract creates a present obligation on the seller to execute and deliver a deed and a present obligation on the purchaser to make payments; (5) whether the right of possession is vested in the purchaser; (6) which party pays the property taxes; (7) which party bears the risk of loss or damage to the property; and (8) which party receives the profits from the operation and sale of the property. * * * [77 T.C. at 1237-1238. Citations and fn. refs. omitted.]

With regard to legal title to the properties in question, the evidence in the record leaves us skeptical as to the accuracy of many of the dates reflected on relevant title documents. A purported early-1975 sales agreement clearly never existed and appears to have been manufactured solely to generate 1975 accrued interest deductions. Alleged missing documents were explained by conjuring up a fire. Deeds were not recorded until months after they purportedly were executed. Sales agreements allegedly were entered into and became effective in December of 1975, even though only a small downpayment in cash was made and no promissory note reflecting the balance of the purchase price was executed until 1976.

The many irregularities in documenting the purported sales transactions raise serious questions in our mind as to whether legal title to the properties was transferred to Tudor II any earlier than the dates the deeds were recorded. Also, the irregularities in documentation, combined with the nonrecourse financing and continued liability of Roberts and his corporations on the original mortgage debt obligations, raise serious questions in our mind as to the good faith and intent of the parties concerning the purported transfer of ownership of the properties to Tudor II.

Significant to our analysis of whether the sale of the properties is to be recognized for tax purposes is whether the stated purchase price of the properties significantly exceeded the fair market value of the properties as of early 1976. The use of nonrecourse financing in the context of excessive purchase price debt suggests that no true sale may have occurred. *Estate of Baron v. Commissioner,* 798

F.2d 65, 68 (2d Cir. 1986), affg. 83 T.C. 542 (1984); *Odend'hal v. Commissioner*, 748 F.2d 908, 912 (4th Cir. 1984), affg. 80 T.C. 588 (1983); *Estate of Franklin v. Commissioner*, 544 F.2d 1045, 1047-1049 (9th Cir. 1976), affg. 64 T.C. 752 (1975); *Brannen v. Commissioner*, 78 T.C. 471, 493 (1982), affd. 722 F.2d 695 (11th Cir. 1984); *Hager v. Commissioner*, 76 T.C. 759, 773-775 (1981).

Where nonrecourse debt is less than or does not unreasonably exceed the value of the related property, payments of principal on the debt lead to the accumulation of equity in the property on behalf of the partners within a reasonable period of time. Where, however, nonrecourse debt is inflated and unreasonably exceeds the fair market value of the property, the debt, for Federal income tax purposes, will not be recognized as genuine. Neither the partnership nor the partners in that situation are regarded as having any legitimate economic interest in the debt or in the property in the reasonably foreseeable future. Even if the value of the property increases, because of the excessive amount of debt principal vis à vis the value of the property, the point in time at which the investors likely will obtain any equity in the property is so remote that realistically the investors are likely to abandon or walk away from the transaction and from the nonrecourse debt. The Ninth Circuit has explained that—

An acquisition * * * at a price approximately equal to the fair market value of the property under ordinary circumstances would rather quickly yield an equity in the property which the purchaser could not prudently abandon. * * * For debt to exist, the purchaser, in the absence of personal liability, must confront a situation in which it is presently reasonable from an economic point of view for him to make a capital investment in the amount of the unpaid purchase price. * * * [*Estate of Franklin v. Commissioner, supra* at 1048-1049.]

The above principle is particularly applicable to inflated, nonrecourse debt obligations that arise in the context of tax shelter transactions and that represent purported debt obligations between investors and tax shelter promoters or entities controlled by the promoters. Where the nonrecourse debt is between organizations created to effectuate a tax shelter scheme, the economic substance thereof must be carefully scrutized. *Ferrell v. Commissioner*, 90 T.C. 1154,

1186 (1988); *Durkin v. Commissioner,* 87 T.C. 1329, 1376-1377 (1986); *Waddell v. Commissioner,* 86 T.C. 848, 902 (1986), affd. 841 F.2d 264 (9th Cir. 1988).

The appraisals by the expert witnesses in this case of the fair market value of the 13 North Carolina properties, generally as of January 1976, are remarkably close, ranging from $13,995,000 (respondent's expert) to $14,534,000 (petitioners' experts). One of petitioners' experts, however, suggests that in lieu of utilizing traditional appraisal techniques, which generally are based on comparable sales, costs, or capitalization of an historical stream of income, he could support an appraisal for the properties in question in the range of $20 million if allowed to base his appraisal on estimates of the actual performance of the four largest properties (namely, Yorktowne, British Woods, Duke Motor Lodge, and Sleepy Time Inn) in the 10 years subsequent to their purchase by Tudor II. Petitioners' expert refers to his alternate method as an appraisal of the "actual value" of the property, rather than of the fair market value.

Respondent argues that we should reject petitioners' expert's attempt to determine the "actual value" of the properties because, among other reasons, petitioners' expert's alternate method is based on erroneous and speculative estimates and on information and years remote in time to the relevant valuation date. We agree. Petitioners have offered no persuasive reason for us to disregard the essentially agreed-upon fair market value of the properties as determined by the experts using standard appraisal techniques. We have little confidence that petitioners' expert's estimate of "actual value" measures the value of the properties as reliably as the experts' appraisals of fair market value. Among the reasons for rejecting petitioners' expert's "actual value" appraisal is that it is based on incomplete information of the income and expenses relating to the properties in years subsequent to 1979. We also note that in the various foreclosure and bankruptcy proceedings that occurred in subsequent years, significantly less proceeds were realized from the properties than the $24.5 million stated purchase price for the properties in January of 1976.

We hold that on the relevant valuation date, the fair market value of the 13 subject properties was \$14.5 million. The \$24.5 million nonrecourse promissory note executed by Tudor II in favor of OCG, exceeded the fair market value of the properties by \$10 million. This inflated debt associated with the purported sales transactions before us combined with the other factors mentioned, forces us to conclude that Tudor II, for Federal income tax purposes, did not have an ownership or an economic interest in the 13 North Carolina properties during the years in dispute.

### \$24.5 Million Nonrecourse Promissory Note

For the reasons explained, the \$24.5 million nonrecourse promissory note cannot be recognized for Federal income tax purposes. This purported debt obligation is not includable in petitioners' allocation of partnership basis in Tudor II, and accrued interest deductions relating thereto are not deductible. *Estate of Franklin v. Commissioner, supra* at 1047-1049; *Estate of Thomas v. Commissioner,* 84 T.C. 412, 439 (1985).

As we have found, there is no credible evidence that Tudor II actually received the \$2.5 million loan from the Cayman Islands National Bank or that any such funds were used on Tudor II's behalf. The evidence does not establish that this loan was ever received by Tudor II. This purported loan and the interest allegedly accrued and paid thereon is to be disregarded for Federal income tax purposes.

### Profit Objective of Tudor II

Tudor II claims deductions for depreciation, management fees, and other expenses relating to its real estate activities. Deductions for depreciation under section 167, and for management and other business expenses under sections 162 and 212 are allowed only if the expenses are incurred in connection with a legitimate for-profit activity. In order to find that Tudor II was engaged in an activity for profit, we would have to conclude that Tudor II had an "actual and honest objective of making a profit" through its real estate investments. *Ronnen v. Commissioner,* 90 T.C. 74, 91 (1988); *West v. Commissioner,* 88 T.C. 152, 159 (1987); *Landry v.*

*Commissioner,* 86 T.C. 1284, 1303 (1986); *Dreicer v. Commissioner,* 78 T.C. 642, 646 (1982), affd. without opinion 702 F.2d 1205 (D.C. Cir. 1983). See also *Capek v. Commissioner,* 86 T.C. 14, 36 (1986); *Fuchs v. Commissioner,* 83 T.C. 79, 97-98 (1984); *Dean v. Commissioner,* 83 T.C. 56, 73-77 (1984).

Although a reasonable expectation of profit is not required, the activity must be entered into in good faith, with the dominant hope and intent of realizing a profit. Sec. 1.183-2(a), Income Tax Regs.; *Hirsch v. Commissioner,* 315 F.2d 731, 736 (9th Cir. 1963), affg. a Memorandum Opinion of this Court; *Fox v. Commissioner,* 80 T.C. 972, 1006 (1983), affd. without published opinion 742 F.2d 1441 (2d Cir. 1984), affd. sub nom. *Barnard v. Commissioner,* 731 F.2d 230 (4th Cir. 1984), affd. without published opinions sub nom. *Hook v. Commissioner, Krasta v. Commissioner, Leffel v. Commissioner, Rosenblatt v. Commissioner, Zemel v. Commissioner,* 734 F.2d 5-7, 9 (3d Cir. 1984). "Profit" in this context means economic profit, independent of tax savings. *Beck v. Commissioner,* 85 T.C. 557, 570 (1985); *Herrick v. Commissioner,* 85 T.C. 237, 254 (1985); *Surloff v. Commissioner,* 81 T.C. 210, 233 (1983).

Where a partnership is involved, the analysis of profit objective must be made at the partnership level and the proper focus is on the activities and intent of the general partners and promoters. *Polakof v. Commissioner,* 820 F.2d 321, 323 (9th Cir. 1987), affg. a Memorandum Opinion of this Court; *Fox v. Commissioner, supra* at 1006-1007; *Brannen v. Commissioner,* 78 T.C. 471, 502-505 (1982), affd. 722 F.2d 695 (11th Cir. 1984). The issue of whether the requisite profit objective exists is one of fact to be resolved on the basis of all of the evidence. *Landry v. Commissioner, supra* at 1304; *Sutton v. Commissioner,* 84 T.C. 210, 221 (1985); *Brannen v. Commissioner, supra* at 506; *Dunn v. Commissioner,* 70 T.C. 715, 720 (1978), affd. 615 F.2d 578 (2d Cir. 1980).

Section 1.183-2(b), Income Tax Regs., provides a list of some of the factors to be considered in determining whether an activity is engaged in for profit, as follows: (1) The manner in which the taxpayer carries on the activity; (2) the expertise of the taxpayer or his advisors; (3) the time and

effort expended by the taxpayer in carrying on the activity; (4) the expectation that assets used in the activity may appreciate in value; (5) the success of the taxpayer in carrying on other similar or dissimilar activities; (6) the taxpayer's history of income or losses with respect to the activity; (7) the amount of occasional profits, if any, which are earned; (8) the financial status of the taxpayer; and (9) any elements indicating personal pleasure or recreation. See *Brannen v. Commissioner, supra* at 507. None of these factors is conclusive, and the importance of any one factor must be evaluated in the context of each particular case. *Dunn v. Commissioner, supra* at 720.

The close relationship between OCG and Tudor II demands our careful scrutiny of the transactions in question. *Charles Schneider & Co. v. Commissioner,* 500 F.2d 148, 152 (8th Cir. 1974), affg. a Memorandum Opinion of this Court; *Electric & Neon, Inc. v. Commissioner,* 56 T.C. 1324, 1339 (1971), affd. without published opinion 496 F.2d 876 (5th Cir. 1974).

Petitioners argue that the promoters and general partner of Tudor II (namely, Osserman, Garfinkle, and Ms. Galloway) possessed an actual and honest profit objective in connection with the real estate investment and management activities of Tudor II. They have pointed to a number of factors that they contend are indicative of profit objective. Petitioners argue that Tudor II was operated in a business-like manner. Petitioners contend that Roberts, as the previous manager, was familiar with the properties and was well suited to continue managing the properties after selling them to Tudor II.

Petitioners contend that Tudor II's profit objective is further established by: (1) The firing of Roberts when his mismanagement and misappropriation of funds were discovered and by the hiring of a new manager who, among other things, improved maintenance of the properties and implemented a broader rental policy to attract more tenants; (2) the hiring of competent employees to assist Ms. Galloway in her duties as general partner; (3) the personal inspection of the properties by McDonald before OCG agreed to purchase them from Roberts; (4) the selection of distress properties which, with proper management, would only

appreciate in value; and (5) the experience of Osserman and Garfinkle in promoting successful real estate ventures.

Respondent points to numerous factors that, in his view, demonstrate Tudor II's lack of profit objective: (1) McDonald's superficial inspection of the properties in late 1975; (2) the emphasis in the offering memoranda on tax losses that were to become available to the limited partners; (3) the fact that the income and expense projections in the offering memoranda bore no relationship to the expected profit or losses from the 13 North Carolina properties that were purchased; (4) the careless and unbusinesslike manner in which the funds of OCG, Tudor II, and other Osserman and Garfinkle limited partnerships were commingled on the books and in the bank accounts of the various entities; (5) the careless manner in which the financial records of Tudor II were maintained; (6) the inflated, nonrecourse debt financing that served as the financial structure for the purported acquisition of property by Tudor II; and (7) the misdating of documents suggesting bad faith on the part of the promoters and general partner.

We have carefully reviewed the evidence and the arguments of the parties. It is our conclusion that Tudor II's real estate investment activities were not engaged in for profit. Tudor II was not run in a businesslike manner. Ms. Galloway, its managing general partner, had no experience in managing real estate investments. See *Fuchs v. Commissioner*, 83 T.C. 79 (1984). In spite of her lack of experience, Ms. Galloway received as compensation for her limited duties one unit in Tudor II. The unbusinesslike manner in which Tudor II was operated is evidenced by, among other things, the backdating of documents (such as the purchase money mortgage and the deed that conveyed Captain's Bridge), the repeated failure to record deeds of conveyance purportedly reflecting significant land transactions in a timely manner, and by the use of fabricated explanations (such as the alleged office fire) to excuse the absence of documents.

Tudor II selected properties for purchase that had a history of unprofitability and mismanagement. Under those circumstances, Tudor II's retention of the former owner and manager to continue managing the properties is particularly

significant and is inconsistent with any good-faith effort to "turn the properties around."

Tudor II sought to acquire real property with a value of approximately $15 million and executed a debt instrument with respect to the real property in an amount nearly twice that amount without any prior inspection of the property by the general partner. The $24.5 million nonrecourse promissory note was inflated to the point that it effectively precluded any realistic profit from being realized from the property for many years, if ever. The highly inflated debt combined with the optional nature of additional capital contributions due from the limited partners made it very doubtful that Tudor II would survive the losses predictable during the early years of the partnership.

We conclude that Tudor II's ownership and management of the 13 properties was not an activity engaged in for profit, and therefore, that Tudor II is not entitled to deductions with respect to the properties for depreciation under section 167(a) and for operating expenses under section 162, to the extent they exceed the limitations of section 183(b).

*Decisions will be entered under Rule 155.*