SAUL H. AND PANSY M. NOVA, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
NOVA v. COMMISSIONER
Docket No. 21711-92
United States Tax Court
T.C. Memo 1993-563; 1993 Tax Ct. Memo LEXIS 571; 66 T.C.M. (CCH) 1450; November 29, 1993, Filed *571 Decision will be entered under Rule 155. For petitioners: Kandace C. Gerdes. For respondent: Tim Brynteson. PETERSON
PETERSON
MEMORANDUM OPINION PETERSON, Special Trial Judge: This case was heard pursuant to the provisions of section 7443A(b) and Rules 180, 181, and 182. All section references are to the Internal Revenue Code in effect for the years in issue. All Rule references are to the Tax Court Rules of Practice and Procedure. Respondent determined deficiencies in petitioners' Federal income tax for the years 1988, 1989, and 1990 in the respective amounts of $ 3,426, $ 6,926, and $ 7,249. As set forth in the notice of deficiency, the issue is whether a golf sponsorship entered into by petitioner Saul H. Nova was an activity not engaged in for profit within the meaning of section 183(a) during the years involved. In addition, at the time this case was called for trial, the parties informed the Court that petitioners had raised an additional issue of whether petitioners are entitled to a nonbusiness bad debt deduction in the amount of $ 32,500. At the time of filing the petition herein, petitioners resided in Denver, Colorado. 1. Golf Sponsorship Expenses -- Section *572 183
Petitioner Saul H. Nova (hereinafter petitioner) is a successful business executive in the garment industry. His son Jeff is a talented golfer. Jeff began playing golf in high school in a casual manner. After high school he became more serious about golf and played as much as possible during his spare time. During 1980, Jeff's father entered him in a tournament at a local golf club. Jeff won the tournament and at that time he began to seriously consider whether he should pursue the sport professionally since he felt that he might have the talent to become a professional golfer. At that point Jeff had been working in the garment industry for a period of years but was beginning to lose his enthusiasm for the business. He was 22 years of age and felt that because professional golf was undergoing a substantial increase in growth and popularity it was a good time to make a career change. Jeff discussed his idea with his father who encouraged him to follow through with his plan. In 1983, Jeff left the garment industry and moved to Denver, Colorado, to decide on how he should approach his plan to become a golf professional. Jeff took golf lessons from a local professional *573 who subsequently advised him to move to Tucson, Arizona, to begin his golf career by playing on the NGA mini-tour. Mini-tour events have very small purses, but provide competitive experience to young professional players who aspire to move up to the PGA Tour, which is the highest level of professional golf in the United States. In 1984, Jeff moved to Tucson, Arizona, to practice and to play the NGA mini-tour. After one event the NGA mini-tour ceased to exist. Because of his limited resources, Jeff decided he would remain in Tucson to take lessons and to play in local events. Also, since distance was not a factor he felt that he could play in mini-tour events in California. At that time, Jeff had two friends who were playing on the Golden State Players Tour, a mini-tour in California. Because they were good golfers and did not have much success, he decided to take more time to get ready to play the tour by continuing to take lessons and by playing in local events in Tucson. During April 1987, Jeff won the club championship at the TPC Starpass Country Club in Tucson. This was an amateur event and Jeff won by shooting two rounds of 81 and 85, respectively, which would be considered *574 high rounds for a professional. On December 14, 1987, petitioner and Jeff entered into a Professional Golfer/Sponsor Agreement. The agreement was to commence on January 1, 1988, and terminate 3 years later on December 31, 1990. Jeff's obligation under the agreement was to devote all of his time, attention, knowledge, and skill to his professional golf career and to the interest of his sponsor. Jeff agreed to play in a minimum of two professional golf tournaments each month. Petitioner, as Jeff's sponsor, agreed to provide all reasonably necessary expenses to participate in professional golf tournaments not to exceed $ 2,000 per month. Such expenses included, but were not limited to, entry fees, lodging, transportation, and food. The parties interpreted the agreement to mean that not only must the sponsor pay for all golf-related expenses, but also for all of Jeff's personal living expenses. Under the agreement Jeff was to receive 60 percent and petitioner was to receive 40 percent of all prize money in excess of the expenses incurred. Petitioner and Jeff entered into a similar contract on December 3, 1990, for an additional 3-year period, except that the monthly expense commitment *575 was increased to $ 2,500. During 1988, Jeff entered local tournaments in Arizona and California two or three times a month to get experience. The tournaments were set up by local club professionals to help young professionals get started. A fee was charged to each golfer which determined the amount of money that was available to the winners of the events. Jeff did not win any money in these events. Jeff entered the Mission Hills Classic in Palm Springs, California, on June 8, 1988, which was his first mini-tour event. The entry fee was $ 400 and the winning purse was $ 7,000. Jeff scored 74 and 76 and won $ 30. Jeff did not enter any other sanctioned tournaments during 1988. During 1989, Jeff entered 12 mini-tour events on the Golden State Players Tour. The tournaments were 1, 2, and 3-day events with approximately 150 golfers and with purses which ranged from $ 1,100 to $ 7,000. The entry fee in most events was $ 400. To win any money a golfer must make the "cut" which is generally the low 60 scorers, plus ties after 18 or 36 holes of golf. Jeff made only one cut and earned $ 125 during 1989. Jeff also entered several 1-day tournaments, but failed to win any money. *576 During 1990, Jeff entered three events and failed to make the cut in each tournament. During May 1990, Jeff entered the Canadian Tour 1990 Qualifying School with the hope that he could qualify to play on the Canadian Tour to gain experience even though it had fewer tournaments and smaller purses than the PGA Tour. However, he failed to score low enough to qualify to play the Canadian Tour. In addition, Jeff entered the PGA Tour Qualifying School in October 1990, with the hopes of qualifying to play on the regular PGA Tour, or the Ben Hogan Tour (now the Nike Tour), which is the second highest level of professional golf in the United States. The low 45 scorers and ties qualify for PGA Tour membership and the following 70 low scorers qualify for the Ben Hogan Tour. Jeff failed to qualify for either tour. Because of lack of funds Jeff did not participate in any more golf tournaments during 1990. Petitioner maintained a disbursement journal for the expenditures made directly to Jeff or on Jeff's behalf. The records reflect the date of the disbursement and its description. During 1988, 1989, and 1990, petitioner paid $ 12,807, $ 21,493, and $ 26,578, respectively, for Jeff's personal *577 living and golf-related expenses. Included in the above amounts were cash payments made to Jeff which total approximately $ 25,000. Petitioner did not maintain a separate record for those expenses which were specifically related to golf tournaments or other professional golf matters, nor did Jeff account to petitioner for the cash payments. As such, petitioner was not able to determine the exact cost of Jeff's participation in golf tournaments or other golf-related matters. At the time of the trial petitioner was no longer sponsoring Jeff's golfing career. Petitioner ended the sponsorship because he was not financially able to continue to provide the support. Petitioner received no payments from the sponsorship agreement because of Jeff's failure to win enough prize money from the tournaments he entered. During the years involved Jeff won $ 155 and spent approximately $ 60,000 that he received under the sponsorship agreement with petitioner. The PGA Tour is highly competitive and the chances of qualifying to play on the PGA Tour are very remote even for excellent golfers who play professional golf courses in par. Also, once a player qualifies to play on the PGA tour, there *578 is no relative certainty that he will have enough financial success to maintain a self-supporting career. Prior to entering into the sponsorship agreement, Jeff had not won prize money in any of the less competitive local professional tournaments and generally scored above par in such tournaments. Jeff may have been a good amateur golfer, but even at the amateur level he had not won any important tournaments. In fact, the only tournaments he won were limited to his amateur wins at his local club and the club championship at the TPC Starpass Country Club. Petitioner contends he had an honest objective of making a profit from his golf sponsorship contract with his son. Petitioners have the burden of proof to show that respondent's determination is in error. Rule 142(a); Welch v. Helvering, 290 U.S. 111, 115 (1933). Section 183(a) provides that if an "activity is not engaged in for profit, no deduction attributable to such activity shall be allowed under this chapter except as provided in this section." Section 183(c) defines an activity not engaged in for profit as "any activity other than one with respect to which deductions are allowable for the *579 taxable year under section 162 or paragraph (1) or (2) of section 212." In determining whether an activity is one engaged in for profit, petitioner must show that he engaged in the activity with an actual and honest objective of making a profit. Hulter v. Commissioner, 91 T.C. 371, 392 (1988); Surloff v. Commissioner, 81 T.C. 210, 233 (1983); Dreicer v. Commissioner, 78 T.C. 642, 644-645 (1982), affd. without opinion 702 F.2d 1205 (D.C. Cir. 1983). The taxpayer's expectation need not be a reasonable one, but there must be a good faith objective of making a profit. Dreicer v. Commissioner, supra; sec. 1.183-2(a), Income Tax Regs. The determination of whether the requisite profit objective exists is to be resolved on the basis of all of the surrounding facts and circumstances of the case. Hulter v. Commissioner, supra at 393; Golanty v. Commissioner, 72 T.C. 411, 426 (1979), affd. without published opinion 647 F.2d 170 (9th Cir. 1981); *580 sec. 1.183-2(b), Income Tax Regs. Greater weight is to be given to the objective facts than to the taxpayer's mere statement of his intent. Cherin v. Commissioner, 89 T.C. 986, 992 (1987); Dreicer v. Commissioner, supra at 645; sec. 1.183-2(a), Income Tax Regs.
Section 1.183-2(b), Income Tax Regs., provides a list of some of the factors to be considered in determining whether an activity is engaged in for profit. These factors include: (1) The manner in which the taxpayer carried on the activity; (2) the expertise of the taxpayer or his advisers; (3) the time and effort expended by the taxpayer in carrying on the activity; (4) the expectation that the assets used in the activity may appreciate in value; (5) the success of the taxpayer in carrying on other similar or dissimilar activities; (6) the taxpayer's history of income or losses with respect to the activity; (7) the amount of occasional profits, if any, which are earned; (8) the financial status of the taxpayer; and (9) any elements indicating personal pleasure or recreation. No one factor is conclusive in making this determination. Allen v. Commissioner, 72 T.C. 28, 34 (1979). *581 Petitioner was well aware that Jeff's prospect of success on the PGA Tour was at best a 5 to 6-year proposition. On this basis petitioner would have had to expend in excess of $ 100,000 under the agreement before he could expect any reasonable return from the sponsorship. Petitioner failed to financially analyze the sponsorship as a profit-seeking venture or make any attempt to calculate when there might be a return on his sponsorship investment. Based on the facts, it is apparent that petitioner was more concerned with his ability to continue to support Jeff's golfing career than to receive a return from the sponsorship. Petitioner and Jeff did not set goals or financial conditions that had to be met in order to keep the sponsorship in force. Petitioner was fully aware that for the sponsorship to pay off Jeff would have to make it to the PGA Tour. The Ben Hogan Tour and the 1 and 2 day tournaments did not have large enough purses to even allow a successful player to make a career of playing at this level. These events are primarily used to polish a golfer's skills for the purpose of qualifying to play on the PGA Tour. We believe that petitioner's primary purpose in this *582 case was to help his son commence a career in professional golf. Petitioner knew it would be difficult for Jeff to succeed, but he wanted to give him a chance to make it to the PGA Tour. Further, in support of our finding that petitioner's primary concern was to help his son become a successful professional golfer rather than to make a profit under the sponsorship agreement that ended in 1990, is the fact that petitioner executed a new 3-year sponsorship agreement with Jeff to commence in 1991 in spite of the fact that there was no positive indication that Jeff had even a chance to succeed on the tour. Petitioner entered into the new agreement knowing that Jeff had virtually no success on the smaller professional golf tours during the 3-year period of the first sponsorship agreement. We also note that although the sponsorship agreement between petitioner and Jeff was a typical sponsorship agreement, petitioner provided support beyond the terms of the agreement by paying for personal items of support. Under the agreement petitioner was to provide Jeff "with all reasonably necessary expenses to participate in professional golf tournaments." We do not read this provision to mean *583 a sponsor is obligated to provide for a player's personal living expenses. This is simply additional evidence that shows petitioner did not have a profit motive in this case. A consideration of all of the facts in this case leads us to the conclusion that the sponsorship agreement was not entered into by petitioner with an honest objective of making a profit within the meaning of section 183(a), but was entered into by petitioner to give his son the opportunity to make a career change and become a professional golfer. The support was no different than that of any parent who decides to financially help a child with educational expenses or with expenses for other career-seeking endeavors. Accordingly, we find for respondent on this issue. 2. Nonbusiness Bad Debt Loss
The record was left open with regard to this issue to allow petitioners an opportunity to submit documents concerning their claim that a nonbusiness bad debt was incurred for the taxable year 1989. Petitioners submitted bankruptcy documents from the Bankruptcy Court to support their claim that they are entitled to a nonbusiness bad debt deduction. On April 22, 1982, petitioner loaned $ 32,500 to Robert E. *584 Minnis and Ilene Minnis which was evidenced by an unsecured promissory note. On June 2, 1989, the Minnis' were discharged in bankruptcy. There were no assets to pay unsecured creditors. Respondent has not briefed this issue and apparently does not contest petitioners' claim. Accordingly, we find that the nonbusiness bad debt became worthless in 1989. Sec. 1.1662(c)(1), Income Tax Regs.
Decision will be entered under Rule 155.