THOMAS F. MEANEY AND MARY R. MEANEY, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Meaney v. Commissioner
Docket No. 8310-92
United States Tax Court
T.C. Memo 1994-91; 1994 Tax Ct. Memo LEXIS 92; 67 T.C.M. (CCH) 2299; February 28, 1994, Filed *92 Decision will be entered under Rule 155. For petitioners: Craig A. Adams. For respondent: Anita A. Gill and Mark I. Siegel. CHIECHI
CHIECHI
MEMORANDUM FINDINGS OF FACT AND OPINION CHIECHI, Judge: Respondent determined the following deficiencies in, additions to, and accuracy-related penalty on petitioners' Federal income tax: Accuracy-Related
Addition to Tax
Penalty Year
Deficiency
Section 6661(a) [1]
Section 6662(a) 1987
$ 14,232
$ 3,558
-- 1988
14,367
3,592
-- 1989
10,859
-- $ 2,172
The issues for decision are: (1) Did petitioner Thomas F. Meaney engage in horse breeding and racing activities with the objective of making a profit within the meaning of section 183? [2] We hold that he did not. *93 (2) Are petitioners liable for the additions to tax under section 6661(a) for 1987 and 1988 and for the accuracy-related penalty under section 6662(a) for 1989? We hold that they are. FINDINGS OF FACT Some of the facts have been stipulated and are so found. Petitoners were residents of Englewood, Florida, at the time the petition was filed. They timely filed joint Federal income tax returns for 1987, 1988, and 1989. During the years at issue, petitioner Thomas F. Meaney (Dr. Meaney) was the head of the Radiology Department of the Cleveland Clinic Foundation, Cleveland, Ohio (the Cleveland Clinic). During 1987 and 1988, Dr. Meaney worked an average of 12 hours each weekday at the Cleveland Clinic and was also "on call" for approximately four and one-half days each week. During 1989, Dr. Meaney was a full-time consultant to the Cleveland Clinic and was a member of its emeritus staff, which enabled him to choose his own work schedule. Although Dr. Meaney was also available during 1988 and 1989 as a consultant to Metro Health Medical Center in Cleveland, Ohio, and Akron City St. Thomas Hospital in Akron, Ohio, he spent only a nominal amount of time during those years providing *94 consulting services to those hospitals. Dr. Meaney retired from the Cleveland Clinic in 1990. During the years at issue, Dr. Meaney was a member of various radiological associations. He was very active in the American Board of Radiology and the American College of Radiology, having served as a member of the board of trustees of and an examiner for the former organization and as a member of the board of chancellors, chairman, and president of the latter organization. During 1968, petitioners purchased for $ 26,000 a 148-acre farm with a house and two barns that is located in Sherman, New York, about 130 miles from Cleveland. During 1969, petitioners purchased for $ 4,000 an additional 50 acres of adjacent farmland. (Hereinafter, the property owned by petitioners in Sherman, New York, will be referred to as the farm.) For each of the years 1987, 1988, and 1989, Dr. Meaney was entitled to seven weeks of vacation from the Cleveland Clinic. During this period, petitioners spent their vacation and almost all other free time, including most of their weekends, at the farm. Although they had no prior experience in cattle breeding, shortly after petitioners purchased the farm, they *95 decided to breed cattle and began breeding Charolais cattle either in 1968 or 1969. Dr. Meaney believed that, with proper study, advice, and hard work, he could make the venture successful. Petitioners chose Charolais cattle for their breeding operation because studies had indicated that this type of cattle had a lower fat content, which was an important consideration for individuals concerned with lowering their dietary fat intake. However, later studies showed that the benefits from consuming Charolais beef were not as great as originally believed. Consequently, petitioners made a decision in either 1976 or 1977 to abandon their unsuccessful cattle breeding activities. Thereafter, that operation was phased out and ultimately terminated in either 1979 or 1980, by which time petitioners had sold all their remaining cattle. Sometime during 1976, Dr. Meaney decided to breed and race standardbred horses (i.e., trotters and pacers). During that year, he purchased for $ 3,500 and $ 1,267, respectively, a one-third interest in two racehorses, Speedy Honeymoon and Foxy Christine, in which Donald Millar (Mr. Millar) and Jack Rice (Mr. Rice) each also owned a one-third interest. Dr. *96 Meaney was aware that it generally takes a minimum of three to five years before a new standardbred horse breeding operation can realize any profit. This is because, after a broodmare is acquired, it takes approximately one year for a foal to be produced and two to four years for that foal to be ready to race. Nonetheless, Dr. Meaney believed that substantial revenue could be generated from a standardbred horse breeding and racing operation, provided that he carefully selected good quality mares and sires and that they produced offspring of a similar quality. Dr. Meaney chose standardbred horses because he thought that the number of them required for breeding and racing was small enough that he would be able to manage the operation by himself, with minimal help. Although standardbred horses can be used for riding, they generally are not saddle broken, at least not until after the end of their racing careers. None of the horses used in Dr. Meaney's horse breeding and racing operation was saddle broken or ridden. Dr. Meaney had no experience in breeding or racing horses before he began his standardbred horse operation. Consequently, he spent most of the time during which he was *97 not involved in his medical-related activities in acquiring knowledge of, and experience in, breeding and racing standardbred horses. To this end, he consulted with certain individuals experienced in those activities and studied theories regarding the selection of horses for breeding purposes. One such individual whom Dr. Meaney consulted was Mr. Millar who formerly was the executive vice president of the United States Trotting Association (USTA), the official organization for registering standardbred horses, and who was the assistant superintendent of Hanover Shoe Farms, Inc. Mr. Millar had been involved in early studies to classify mares based on the statistical probability that the maternal family would produce offspring with high speed potential. Dr. Meaney sought his advice regarding the selection of his broodmares and the sires with which to breed those mares. Dr. Meaney also consulted Mr. Rice for advice on the selection of sires for breeding with his mares. Mr. Rice had been involved in standardbred horse breeding and racing for a number of years and ran Hobnobbin Farm, a standardbred horse operation located near petitioners' farm. Dr. Meaney further consulted Dr. William *98 Tyznik, a professor of animal nutrition at Ohio State University with a primary interest in horses. Dr. Tyznik provided advice with respect to the selection of feeds and feeding patterns for Dr. Meaney's horses. Typically, in standardbred horse breeding and racing operations, mares are bred in the spring, their offspring (foals) are raised, and, as yearlings, they are either sold at auction or trained for racing, raced, and then sold after having established themselves as successful racehorses. Dr. Meaney was primarily interested in training his yearlings, racing them, and thereafter selling them in order to benefit directly from any "superstar" horses foaled by his broodmares. His decision to train and race horses was influenced by his having read in "Hoofbeats", a monthly periodical published by the USTA, that many of the horses that had been sold at yearling auctions later became racing superstars. Although Dr. Meaney frequently engaged in medical research while at the farm during 1988, he also undertook during that year and the two other years at issue the various tasks customarily associated with raising and breeding horses. These included feeding, watering, and grooming *99 them, cleaning their stalls, obtaining supplies, building and repairing fences, maintaining and repairing the farm equipment, entering into breeding contracts, transporting the mares to the location of the stallions, transporting the mares back after breeding, observing the foaling by the mares, transporting the mares and foals to the location of other stallions for subsequent breeding, transporting the mares and foals back after that breeding, and observing the subsequent foaling by the mares. Petitioner Mary R. Meaney also fed, watered, and groomed the horses, cleaned their stalls, and obtained supplies. Dr. Meaney hired a married couple (the couple) on a contract basis to feed and water the horses and provide security services when petitioners were not at the farm. Dr. Meaney's horses generally were not kept in stalls but had free access to shelter or to unsheltered fenced-in areas. The couple did not groom or exercise the horses. Dr. Meaney paid them approximately $ 3 to $ 5 for each day on which they worked. Petitioners have eight children. During 1987, the children's ages ranged between 20 and 34 years. The youngest child, who is mentally challenged, accompanied petitioners *100 on all of their visits to the farm. The other children, one of whom lives about five miles from the farm, occasionally visited petitioners there. None of petitioners' children spent any time at the farm engaging in Dr. Meaney's horse breeding and racing activities. Dr. Meaney began purchasing hay for his horse operation in approximately 1986, when the cost to purchase it became less than the cost to raise and harvest it. Dr. Meaney also purchased hand-mixed feed when it was less than the cost of premixed feed. Dr. Meaney owned or had an interest in a total of three mares that he used in his breeding operation. He acquired his first broodmare, Tantalizing, during 1979, having paid $ 3,500 for her. During 1981, Dr. Meaney purchased for $ 6,500 a second broodmare, Shade of Chris. During 1983, Dr. Meaney purchased from Mr. Rice for $ 4,000 a one-half interest in a third broodmare, Melsapoppin. Mr. Rice retained ownership of the other one-half interest in that mare which continued to be boarded at Mr. Rice's Hobnobbin Farm. During the years indicated, Tantalizing, Shade of Chris, and Melsapoppin bore the following foals which Dr. Meaney owned or in which he had an ownership interest: *101 Broodmare
Year
Tantalizing
Shade of Chris
Melsapoppin *
1982
Steal Your Heart
-- **
1983
Blarney Stone
--
--
1984
--
Byte the Bit
Collision Bend
1985
Meansome
Meanit
Music Show
1986
Mean Tanty
Mean Chris
--
1987
B Anne
--
--
1988
Mean Spirit
--
Mean A Poppin ***
1989
Mean Colleen
--
Poppin Along ***
1990
--
--
Undisputed
* Since Dr. Meaney owned only a one-half interest in
Melsapoppin, he owned at their birth only a one-half interest
in the foals born to that mare.
** Dr. Meaney did not own an interest in Melsapoppin during 1982.
*** Dr. Meaney traded his one-half interest in Poppin Along to
Mr. Rice for Mr. Rice's one-half interest in Mean A Poppin.
The foals were not born on petitioners' farm. Dr. Meaney sent his pregnant broodmares for foaling to Hobnobbin Farm about two weeks before their expected delivery dates. The horses were returned to the farm about two weeks thereafter unless the mare was to be immediately rebred, in which case the mare and foal were transported to the breeding farm. Dr. Meaney did not actively advertise his horse breeding activities. He believed that there was no need to do so because the necessary information *102 regarding the horses (e.g., the name of the horse, its owner and breeder, its pedigree, and the recent races and times run by the horse) already was provided in the racing programs available at the racetracks where he raced his horses. Shade of Chris produced no offspring after 1986 because she developed an infection during the pregnancy with either Meanit or Mean Chris which caused a problem with lactation. Dr. Meaney decided to discontinue breeding her until it was determined whether the infection would end; it did not. Dr. Meaney sent Shade of Chris to Winter Miles Training Center in Oviedo, Florida, during November 1987 for the 1987-88 racing season. He also boarded Shade of Chris at Hobnobbin Farm for some time during 1988. Dr. Meaney selected and employed professional trainers to train the yearlings chosen to be raced. He sent such yearlings to the trainers when they were about 18 months old. Horses in training for racing generally remained with the trainer from October or November until late spring of the following year. During 1990, Dr. Meaney engaged the services of a new trainer for one of his horses. Those services cost approximately $ 200 per month less than the *103 cost of trainers whom Dr. Meaney used for his other racehorses. In the standardbred horse racing industry, funds for the major purses in a big race are provided through "stake" payments by the owners of the horses running in that race. The owner selects the race or races in which he or she wants the horse to compete and makes the "stake" payments accordingly. The "stake" payments begin when the foal is around six months old. Sustaining payments are continued at roughly six-month intervals until the race for which the stake payment has been made is run or the decision is made not to have the horse compete in that race. Dr. Meaney made "stake" payments for some of his racehorses. Dr. Meaney considered the racetrack to be the marketplace for the horses he primarily was interested in selling, viz, horses already trained as racehorses. At a horse race, a horse owner can indicate that a horse is available for sale by putting that horse in a "condition race". Dr. Meaney did not enter any of his horses in "condition races". Two of Dr. Meaney's broodmares, Shade of Chris and Melsapoppin, were not raced. Tantalizing, his third broodmare, was raced, but not successfully. Dr. Meaney *104 raced at least some of the horses produced by his broodmares. Collision Bend and Mean Tanty were unsuccessful as racehorses. Meansome and Meanit were injured at various times before and after Dr. Meaney sold them and, as a result, they had abbreviated racing careers. Mean Chris was injured in a race late in the fall of 1989, was not raced during 1990, and went lame in the spring of 1991. Thereafter, Mean Chris was retired from racing. Mean Spirit developed equine encephalitis in 1991 and had to be destroyed. Speedy Honeymoon, in which Dr. Meaney purchased a one-third interest in 1976, was not a successful racehorse. During the years indicated, Dr. Meaney sold the following horses, or an interest in them, for the amounts stated: Sales Price And/Or Amount Netted
Year
Sales
Sales Price
Netted
1981
Speedy Honeymoon (1/3 interest)*
$ 5,000  1985
General Fund (1/16 interest)
1,250  Blarney Stone (1/2 interest)
500  1986
Meansome and Meanit (1/3 interest)
4,000  Steal Your Heart
900  Collision Bend (1/4 interest)
125  Byte The Bit**
900  $ 279
Unidentified horses***
4,254  1987
Music Show
Not in record
1988
Meansome (2/3 interest)
667  1989
Meanit (2/3 interest)
4,000  1990
Mean Tanty
375
Mean Colleen
1,100  800
Tantalizing
555  Shade of Chris****
Not in record
Unidentified horses*****
3,829  * It is not clear from the record whether Dr. Meaney sold his interest in
Speedy Honeymoon in 1981 or 1982. He may also have sold in 1981 his interest
in Impetuous, a horse in which he purchased an interest from Mr. Rice for
$ 6,000 in 1979.
** The evidence establishes that Byte the Bit was sold in 1986, although the
parties stipulated to a sales date in 1987 for that horse. We are not bound
by a stipulation where it is clearly contrary to facts disclosed by the
record. See Jasionowski v. Commissioner, 66 T.C. 312, 318 (1976).
*** Petitioners reported $ 9,279 in income from horse
sales on Schedule F of their 1986 return, of which $ 5,025 was
specifically identified from sales of Collision Bend, Steal Your Heart, and
a one-third interest in Meansome and in Meanit. Presumably, the sales
proceeds from Byte and Bit were included in income on the Schedule F for
1987 since they were received in that year. The record does not show from
from which horse or horses the remaining $ 4,254 in sales proceeds reported for 1986 were derived.
**** Dr. Meaney may have sold Shade of Chris in 1991.
***** Petitioners reported $ 5,559 in income
from horse sales on Schedule F of thier 1990 return, of which $ 1,730 presumably was derived from the sales of Mean Tanty, Mean Coleen, and
Tantalizing. The record does not show from which horse or horses the
remaining $ 3,829 in sales proceeds reported for 1990 were derived.
The proceeds from the sales of unidentifed horses may or may not include
proceeds from the sale of Shade of Chris. See note above.
*105 Dr. Meaney achieved a sense of pride from his horse breeding and racing activities. He enjoyed them to the same extent that he enjoyed the practice of medicine. Dr. Meaney expected his horses to increase in value as a result of their breeding, management, nutrition, and training. Because of the injuries to Mean Chris during 1989, Dr. Meaney decided that he would have to either abandon the horse breeding and racing operation or expand it by purchasing more broodmares in order to obtain more foals each year. During 1990, he decided to abandon the operation. Dr. Meaney maintained a separate checking account for the farm under the name of Chautauqua Creek Farm. On occasion, when the proper checkbook was not available, Dr. Meaney wrote checks from the farm checking account to pay personal expenses or from his personal checking accounts to pay farm expenses. His general practice, however, was to transfer funds from his personal accounts to the farm account, when necessary, in order to pay farm expenses from the farm account. At least for the years at issue, Dr. Meaney used a personal computer to maintain and summarize income and expense records relating to his horse breeding and *106 racing activities, including horse sales, racing purses, breeding fees, boarding fees, training expenses, and veterinary expenses. Dr. Meaney used the computer summaries to prepare petitioners' income tax returns and to compare their current income and expenses with the results from prior years. He also retained other records relating to boarding fees and training expenses for his horses. However, Dr. Meaney did not keep complete and/or accurate records of the dates on which his foals were born, the dates on which he bought or sold horses, or the amounts for which he sold his horses. By way of illustration, Dr. Meaney's records indicate that he paid boarding fees for Music Show in September, October, and November 1987 and January 1988, although they also show that Music Show was sold in May 1987. Dr. Meaney did not maintain complete or accurate records of the dates on which his foals were born or his horses were purchased and sold because he believed recordation of that information would merely duplicate the official records maintained by the USTA. The USTA's publication, Sires and Dames, lists pedigree information. The USTA also maintains records of the racing careers of the *107 standardbred horses registered with it. Dr. Meaney did not maintain a recordkeeping system from which he could assess and/or attempt to improve the overall profitability of his horse breeding and racing operation. Although petitioners moved to Florida in the summer of 1990, they retained ownership of the farm. In fact, petitioners still owned the farm in May 1993 when this case was tried. Petitioners have not had their farm appraised to ascertain its fair market value. Based on the sales prices of certain other farms located near the farm, Dr. Meaney estimated that, at the time of trial, the farm would sell for approximately $ 400 to $ 600 per acre. The value of farm property in the area in which the farm is situated varied based on a number of factors, including the value of the land and the presence and value of oil, gas, and timber interests. In their Federal income tax returns for the years 1977, 1978, 1979, 1980, and 1981, petitioners claimed losses on Schedule F relating to Dr. Meaney's horse breeding and racing operation (and to the cattle breeding operation for 1977 through 1979 or 1980) in the respective amounts of $ 19,382.69, $ 15,408.85, $ 8,434.00, $ 31,061.11, *108 and $ 31,899.66. In their tax returns for the years 1982 through 1990, petitioners reported W-2 wages from the Cleveland Clinic and adjusted gross income, which reflected losses from Dr. Meaney's horse breeding and racing operation, in the following amounts: W-2 Wages from the Schedule F Adjusted
Year
Cleveland Clinic
Losses Gross Income
1982
$ 191,752.30
$ 34,239.80
$ 148,024.93
1983
216,596.00
36,497.74
164,048.45
1984
236,327.64
42,379.36
179,677.79
1985
260,118.00
37,597.98
195,400.00
1986
265,243.00
38,009.00
205,792.00
1987
290,163.00
36,239.00
251,292.00
1988
297,081.21
48,717.00
266,089.00
1989
259,524.00
35,518.00 * 287,058.00
1990 **
34,286.00
588,417.00
*Adjusted gross income included $ 9,248 in pension income Dr.
Meaney received from the Cleveland Clinic during 1989. Dr.
Meaney also reported $ 33,900 from medical consulting services and
$ 38,895 from honoraria and travel reimbursement from the American
College of Radiology, the American Board of Radiology, and others
on a Schedule C filed with petitioners' 1989 return.
**No W-2 wages were reported in petitioners' tax return for
1990. However, Dr. Meaney reported $ 574,003 from medical
consulting services on Schedule C filed with the 1990 tax return,
as well as $ 54,770 in pension income received from the Cleveland
Clinic during 1990.
*109 The adjusted gross income for 1982 through 1990 that is shown above included losses from real estate partnerships that petitioners reported on Schedule E of their tax returns. In their returns for 1985 through 1988, petitioners also reported on Schedule E losses from the rental of a condominium located in Sanibel, Florida. The adjusted gross income for 1982 through 1990 that is shown above also included lease and royalty income from three gas wells located on the farm. On Schedule F of petitioners' tax returns for the years indicated, Dr. Meaney reported the following income from his horse breeding and racing activities: New York
Horse
Right-
Horse
Racing
Breeders
Year
of-Way
Sales
Purses
Fund
Total
1982 * $ 1,488.00
$ -
$ -
$ -
$ 1,488.00
1983
-
-
-
-
-
1984
-
-
1,981.70
-
1,981.70
1985
-
1,750.00
7,757.02
-
9,507.02
1986
- **9,279.00
1,564.00
682.00
11,525.00
1987
-
279.00
-
-
279.00
1988
-
667.00 ***2,761.00
-
3,428.00
1989
-
4,000.00 ****6,672.00
-
10,672.00
1990
-
5,559.00
2,806.00
-
8,365.00
Total
$ 1,488.00
$ 21,534.00
$ 23,541.72
$ 682.00
$ 47,245.72
*Presumably, petitioners sold a right-of-way on their farm for this amount.
**Of this total, the record specifically identifies only $ 5,025 which are
proceeds relating to the sale of Collision Bend ($ 125), Steal Your Heart
($ 900), and a one-third interest in Meansome and in Meanit ($ 4,000).
***Mean Chris won at least $ 1,003 of those purses.
****Mean Chris won at least $ 5,384.85 of those purses.
*110 Dr. Meaney reported expenses, including depreciation, on Schedule F of petitioners' Federal income tax returns for the years indicated in the following amounts: Total Depreciation
Schedule F
Included on Year
Expenses
Schedule F
1982
$ 35,727.80
$ 4,137.03
1983
36,497.74
8,589.36
1984
44,361.06
5,549.80
1985
47,105.00
6,539.35
1986
49,534.00
9,885.00
1987
36,518.00
8,840.00
1988
52,145.00
8,254.00
1989
46,190.00
2,659.00
1990
42,651.00
1,451.00
In the notice of deficiency, the Commissioner disallowed the losses relating to Dr. Meaney's horse breeding and racing activities that were claimed on Schedule F of petitioner's tax returns for 1987, 1988, and 1989 on the ground that those activities were not engaged in with the objective of making a profit. OPINION Petitioners bear the burden of proving that the determinations made by respondent in the notice of deficiency are not correct. Rule 142(a); Welch v. Helvering, 290 U.S. 111, 115 (1933). I. Section 183
A. In General
Section 183(a) generally limits the amount of expenses that a taxpayer may deduct with respect to an activity "not engaged in for *111 profit" to the deductions provided in section 183(b). Section 183(b)(1) provides that deductions that would be allowable without regard to whether such activity is engaged in for profit are to be allowed. Section 183(b)(2) further indicates that deductions which would be allowable only if such activity is engaged in for profit are to be allowed, but only to the extent that the gross income derived from such activity for the taxable year exceeds the deductions allowable under section 183(b)(1). An activity is "not engaged in for profit" if it is an activity other than one with respect to which deductions are allowable for the taxable year under section 162 or section 212(1) or (2). Sec. 183(c). In the case of an activity which consists in major part of the breeding, training, showing, or racing of horses, if the gross income derived from such activity exceeds the deductions for any two of seven consecutive taxable years, the activity is presumed to be engaged in for profit unless the Commissioner establishes to the contrary. Sec. 183(d). Because Dr. Meaney's horse breeding and racing activities operated at a loss since their inception in 1976, no such presumption applies in *112 the instant case. In determining whether an activity is engaged in for profit, the taxpayer must show that he or she engaged in the activity with an actual and honest objective of making a profit. E.g., Hulter v. Commissioner, 91 T.C. 371, 392 (1988); Dreicer v. Commissioner, 78 T.C. 642, 645 (1982), affd. without opinion 702 F.2d 1205 (D.C. Cir. 1983). Although the taxpayer's expectation of a profit need not be reasonable, he or she must have a good faith objective of making a profit. E.g., Dreicer v. Commissioner, supra; Dunn v. Commissioner, 70 T.C. 715, 720 (1978), affd. on another issue 615 F.2d 578 (2d Cir. 1980); sec. 1.183-2(a), Income Tax Regs. Petitioners bear the burden of proving the requisite intent. E.g., Golanty v. Commissioner, 72 T.C. 411, 426 (1979), affd. without published opinion 647 F.2d 170 (9th Cir. 1981); Johnson v. Commissioner, 59 T.C. 791, 813 (1973), affd. 495 F.2d 1079 (6th Cir. 1974). *113 Whether a taxpayer engaged in an activity with the requisite profit objective is determined from all the facts and circumstances. E.g., Hulter v. Commissioner, supra at 393; Taube v. Commissioner, 88 T.C. 464, 480 (1987); Golanty v. Commissioner, supra; sec. 1.183-2(a) and (b), Income Tax Regs. More weight is given to objective facts than to the taxpayer's mere statement of his or her intent. E.g., Dreicer v. Commissioner, supra at 645; sec. 1.183-2(a), Income Tax Regs.
The regulations promulgated under section 183 list the following nine factors that should normally be taken into account in determining whether an activity is engaged in for profit: (1) The manner in which the taxpayer carried on the activity, (2) the expertise of the taxpayer or his advisers, (3) the time and effort expended by the taxpayer in carrying on the activity, (4) the expectation that assets used in the activity may appreciate in value, (5) the success of the taxpayer in carrying on other similar or dissimilar activities, (6) the taxpayer's history of income or loss *114 with respect to the activity, (7) the amount of occasional profit, if any, which is earned, (8) the financial status of the taxpayer, and (9) the extent to which elements of personal pleasure or recreation are involved. Sec. 1.183-2(b), Income Tax Regs. The list of factors in the regulations is not exclusive, and other factors may be considered in determining whether an activity is engaged in for profit. No single factor is dispositive. E.g., Golanty v. Commissioner, supra at 426; sec. 1.183-2(b), Income Tax Regs. The determination of a profit objective does not depend on counting the number of factors that support each party's position. E.g., Dunn v. Commissioner, supra; sec. 1.183-2(b), Income Tax Regs.
The parties agree that Dr. Meaney's horse breeding and racing operation constitutes one activity for purposes of section 183. See sec. 1.183-1(d)(1), Income Tax Regs. They disagree about whether, during the years at issue, that activity was engaged in for profit within the meaning of section 183. Petitioners contend that it was and that therefore they are entitled to deduct the losses incurred in carrying *115 on that activity that were claimed on Schedules F of the returns filed for those years. Respondent contends that Dr. Meaney did not carry on his horse breeding and racing operation with the requisite profit motive. We agree with respondent. Although we found Dr. Meaney to be credible, an analysis of all the objective facts and circumstances in the record does not support his claim. Because the parties argue their respective positions by addressing each of the factors listed in the regulations under section 183, we shall follow the same approach here. B. Facts and Circumstances Relating to Dr. Meaney's Horse Operation
1. The manner in which the activity is carried on
To support their contention that Dr. Meaney conducted his horse breeding and racing activities with the objective of making a profit, petitioners contend that Dr. Meaney conducted those activities in a businesslike manner and that he maintained complete and accurate books and records for the purpose of cutting expenses, increasing profits, and evaluating the overall performance of the operation of those activities. Petitioners further assert that Dr. Meaney purchased horses jointly with other individuals *116 to reduce expenses attributable to those horses and that he took other steps in an attempt to minimize losses associated with his horse operation. Respondent counters that Dr. Meaney did not maintain accurate records and did not conduct the horse breeding and racing activities in a manner consistent with a profit motive. She contends that (1) he prepared the majority of his records after the fact and in preparation for the trial, (2) he retained horses even after they had no breeding or racing purpose, and (3) he produced receipts for boarding expenses of a horse after he sold the horse. From our review of all the evidence, we find that Dr. Meaney did not maintain a recordkeeping system consistent with a profit motive. Some of the records Dr. Meaney introduced at trial were ambiguous, unclear, and/or incomplete. As a result, we found it difficult or impossible at times to find the facts relevant to our determination of whether Dr. Meaney had an actual and honest objective of making a profit from his horse operation. Although Dr. Meaney did maintain, at least for the years at issue, records detailing the income and expenses relating to his horse operation, those records were *117 not totally accurate and/or complete. Moreover, there is a dearth of records that have been introduced into evidence of the type that we believe Dr. Meaney would have needed in order to evaluate the overall profitability of that operation and to assess what he needed to do to enhance the likelihood of turning his unprofitable operation into a profitable one. Specifically, Dr. Meaney did not maintain his own contemporaneous records of the dates on which his foals were born or sold or of the purses won by each of his racehorses. The records he did keep as to purchase prices and sales prices for the horses that he bought or sold are in certain respects inaccurate and/or incomplete. [3] Thus, on the basis of the instant record, we conclude that Dr. Meaney had no adequate recordkeeping system with which he could evaluate the success of his horse breeding and racing activities and/or determine what steps he should take to attempt to make his operation profitable. *118 Dr. Meaney contends that he did not need to maintain detailed records on his horses because such records would merely have duplicated information otherwise contained in the official records maintained by the USTA. We are not persuaded from the record herein that the USTA records provided sufficient information with which Dr. Meaney could have evaluated the profitability of, and minimized the losses resulting from, his horse breeding and racing activities. We believe that if Dr. Meaney in fact had intended to operate his horse operation at a profit, he would have maintained adequate records of his own and would not have relied on records prepared by the USTA. Petitioners point to the fact that Dr. Meaney maintained a separate bank account and, at least for the years at issue, maintained records of income and expenses for his horse breeding and racing operation that permitted the preparation of petitioners' tax returns. However, as noted above, some of those records are inaccurate and/or incomplete. More importantly, we are not persuaded that Dr. Meaney used his books and records during the years at issue in an effort to make his horse breeding and racing operation profitable. *119 Even though Dr. Meaney asserts that he used the records relating to that operation to reduce expenses, increase profits, and evaluate its overall performance in order to improve it, we are not persuaded by the instant record that the few actions Dr. Meaney undertook before or during the years at issue to cut expenses would have significantly reduced the cost of operating his horse breeding and racing operation or would have otherwise substantially increased the likelihood that that operation would generate a profit. It is also noteworthy that the record in this case indicates that Dr. Meaney incurred expenses for which no apparent business purpose existed. For example, although Shade of Chris was not raced, and during a time when she could not be bred because of an infection, Dr. Meaney transported her to Florida and boarded her for the 1987-88 racing season at a horse training facility. In addition, he boarded Shade of Chris at Hobnobbin Farm during 1988 even though she was not in foal or being bred. Dr. Meaney's records also indicate that he paid boarding fees for Music Show after he had sold the horse. There is scant evidence in this case that before or after he began his *120 horse operation Dr. Meaney made any study of the profit potential of breeding and racing standardbred horses. Although a formal market study is not required, failure to make the most basic investigation of the factors that affect profit is indicative of the absence of a profit motive. Nor are we persuaded that, having experienced years of losses, Dr. Meaney asked anyone for advice as to how to cut expenses or increase income to help make his operation profitable. Petitioners did not introduce any contemporaneous profit plans or business plans for Dr. Meaney's horse breeding and racing operation. Nor did Dr. Meaney apparently ever conduct any break-even analysis regarding that operation. He did not testify as to when, if ever, he expected the enterprise to achieve a positive cash flow. There is no evidence in the record that Dr. Meaney ever consulted any books or any person about the financial side of the operation. Dr. Meaney thus did not show that he sought or acquired the financial expertise that would have assisted him in turning the horse breeding and racing operation into a profitable business. Based on the foregoing facts and circumstances, factor one favors respondent. *121 2. The expertise of the taxpayer or his advisers
Petitioners contend that Dr. Meaney spent considerable time and effort in acquiring knowledge and experience relating to breeding and racing standardbred horses. Respondent questions the propriety of Dr. Meaney's reliance on Mr. Rice for advice and the type of advice that he sought. Although Dr. Meaney had no experience in horse breeding or racing before he undertook the horse breeding operation at the farm, he went to great lengths to gain knowledge of and develop expertise in that endeavor. Dr. Meaney read books and articles about horse breeding. He sought and followed the advice of experienced horse breeders. He also retained experienced trainers for his racehorses. We believe that Dr. Meaney's lack of personal expertise at the beginning of his horse breeding and racing activities was offset by the knowledge he acquired from his consultation with experts in the industry and the independent investigations he conducted throughout the course of those activities. The foregoing facts and circumstances indicate factor two favors petitioners. 3. The time and effort expended by the taxpayer in carrying on the activity
*122 Petitioners contend that Dr. Meaney spent a great deal of time and effort engaging in his horse breeding and racing operation. In addition, they assert that Dr. Meaney used the services of others when he was unable to perform activities related to that operation. Respondent suggests that Dr. Meaney has overstated his involvement in his horse breeding and racing activities. During the years at issue, Dr. Meaney spent almost all of his free time on tasks relating to his horse operation at the farm. He visited the farm on most weekends and during his vacation. It was not necessary for Dr. Meaney to take a more active role in the operation to have a bona fide profit objective because he hired and/or relied on competent and qualified persons to advise and assist him. Sec. 1.183-2(b)(3), Income Tax Regs.
Under the foregoing circumstances, factor three favors petitioners. 4. The expectation that assets used in the activity may appreciate in value
Petitioners contend that Dr. Meaney expected the value of the farm and the horses to appreciate. Although respondent does not address petitioners' contention that Dr. Meaney expected the value of the horses to appreciate, she does *123 assert that petitioners have produced no evidence concerning the appreciation in value of the farm. Respondent further argues that, even if the farm had appreciated in value, that appreciation is irrelevant in evaluating the profitability of the horse breeding and racing activities because the income from those activities does not exceed the deductions relating thereto that are not directly attributable to the holding of the land (e.g., deductions other than interest on a mortgage secured by the land and annual property taxes attributable to the land and improvements). Sec. 1.183-1(d)(1), Income Tax Regs.
Although petitioners contend that the farm was purchased and held primarily for the purpose of conducting the horse operation and that the holding of the farm to obtain a profit from its appreciation was collateral to that purpose, the record does not support that contention. Petitioners decided to engage in cattle breeding activities after they purchased the farm in 1968. Dr. Meaney did not begin to use the farm in his standardbred horse breeding and racing activities until 1976. Thus, the farm was not acquired for the purpose of conducting the horse operation. Nor are we *124 convinced that petitioners held the land after its acquisition primarily for the purpose of conducting Dr. Meaney's horse breeding and racing activities. Although he decided to abandon those activities in 1990 and moved to Florida, petitioners continued to hold the farm at least as of the trial herein. Under such circumstances, we conclude that carrying on a horse breeding and racing operation was not petitioners' primary purpose in acquiring and retaining the land. As for petitioners' contention that Dr. Meaney expected that his racehorses would appreciate in value, on the instant record, we find that Dr. Meaney took steps designed to increase the possibility that his racehorses would win racing purses, in which event they would appreciate in value. For example, the record establishes that Dr. Meaney consulted experts in breeding his horses for speed. He also consulted an expert in animal nutrition in order to select the right mix of feed and feeding patterns to produce good racehorses. However, the record does not disclose whether or how Dr. Meany intended in good faith that the expected appreciation in the value of his horses, when realized, would, together with the income *125 from his horse operation, exceed the expenses of that operation. See, e.g., sec. 1.183-2(b)(4), Income Tax Regs.
Under the foregoing circumstances, factor four favors respondent. 5. The success of the taxpayer in carrying on other similar or dissimilar activities
Petitioners contend that factor five is not relevant because petitioners did not engage in any similar horse breeding activities in the past. Respondent counters that petitioners conducted an unsuccessful cattle breeding operation before Dr. Meaney began his horse breeding and racing operation at the farm. There is no evidence that Dr. Meaney ever converted an unprofitable enterprise into a profitable one. Both before and during the years at issue, Dr. Meaney was a salaried employee of the Cleveland Clinic, except for 1989 when he provided full-time consulting services to that hospital. Petitioners carried on an unsuccessful cattle breeding operation on their farm for approximately 10 years before they abandoned that activity. In addition, they sustained losses from real estate rental activities over the same period during which Dr. Meaney was involved in the horse operation. Under the foregoing facts and circumstances, *126 factor five favors respondent. 6. The taxpayer's history of income or loss with respect to the activity
Petitioners contend that the breeding of racehorses has long been recognized as a financially hazardous undertaking and that initial or start-up losses are common in that business. Respondent counters that petitioners have reported a total of $ 449,652.19 in losses on Schedule F of their returns for 1977 through 1990. Dr. Meaney sustained losses in his horse operation from its inception in 1976 through 1990, when he decided to abandon it. A record of substantial losses over many years and the unlikelihood of achieving a profitable operation are important factors bearing on a taxpayers's actual intention. Golanty v. Commissioner, 72 T.C. at 426. We recognize that a series of losses during the initial stage of an activity does not necessarily indicate that the activity was not engaged in for profit. Sec. 1.183-2(b)(6), Income Tax Regs. We also acknowledge that losses sustained because of unforeseen or fortuitous circumstances beyond the control of the taxpayer do not indicate that the activity was not engaged in for profit. Engdahl v. Commissioner, 72 T.C. 659, 669 (1979); *127 sec. 1.183-2(b)(6), Income Tax Regs. In this connection, we note that the fact that Shade of Chris could not be bred after 1986 because of an infection could explain some of the losses incurred during the years at issue. We further observe that the majority of Dr. Meaney's claimed deductions are out-of-pocket expenses and are not related to depreciation or other items for which a deduction is permitted without a payment during the taxable year. We also acknowledge that Dr. Meaney decided to, and did, abandon his horse operation in 1990, rather than invest more funds in that operation after Mean Chris suffered injuries in 1989. These facts facially tend to support Dr. Meaney's position. Nevertheless, the record does not disclose whether or how injuries to one or more of Dr. Meaney's racehorses affected profitability before 1989. The record does not explain the losses incurred for 1987 and 1988. Meansome and Meanit apparently received some injuries before 1989, but the seriousness of those injuries is not disclosed. Although Dr. Meaney's remaining interest in Meansome was sold in 1988 for $ 667, the record does not indicate whether injuries affected the sales price. Dr. Meaney's *128 remaining interest in Meanit was sold in 1989 for $ 4,000. There is no evidence that the sales price for Meanit would have been higher if the horse had not sustained any injuries. Mean Spirit was born in 1988 and would not have been trained for racing until after the years at issue. Petitioners contend that the fact that Mean Spirit developed equine encephalitis and had to be destroyed affected profits. However, the record indicates that Mean Spirit developed the illness in 1991, which was the year after Dr. Meaney decided to abandon his horse operation. Moreover, as discussed above, the record shows that Dr. Meaney incurred expenses for which there was no discernable business purpose. For example, he paid what appear to be unnecessary boarding fees for Shade of Chris and Music Show. In addition, Dr. Meaney did not sell Shade of Chris until many years after she no longer could be bred. Thus, although there is some evidence that Dr. Meaney attempted to cut costs (e.g., buying cheaper hay and hand-mixed feed and retaining a less expensive horse trainer), we are unable to conclude in light of the entire record that Dr. Meaney made any meaningful attempts to change his operation *129 in order to make it profitable. Under the foregoing circumstances, factor six favors respondent. 7. The amount of occasional profit, if any, which is earned
Petitioners contend that although Dr. Meaney did not earn a profit for any of the years in which he was engaged in his horse breeding and racing activities, the highly speculative nature of the venture presented the opportunity to earn a substantial profit. Respondent asserts that Dr. Meaney had a loss in every year of his horse operation. As noted above, Dr. Meaney's horse breeding and racing activities never earned a profit. Furthermore, none of the horses foaled by Dr. Meaney's broodmares sold for a high price. Although an opportunity to earn a substantial ultimate profit in a highly speculative venture may be sufficient to indicate that the activity is engaged in for profit even though only losses are generated, we are not persuaded from the record in the instant case that a substantial ultimate profit was more than a remote dream. Sec. 1.183-2(b)(7), Income Tax Regs.
Under the foregoing facts and circumstances, factor seven favors respondent. 8. The financial status of the taxpayer
Petitioners assert *130 that, regardless of the amount of income they earned from other activities, Dr. Meaney engaged in the horse breeding and racing activities with the requisite objective of making a profit. Respondent contends that the losses provided tax benefits for petitioners. Dr. Meaney's income from the Cleveland Clinic was substantial and was sufficient to enable petitioners to maintain a comfortable standard of living notwithstanding the losses from the horse breeding and racing operation. Golanty v. Commissioner, 72 T.C. at 428-429. The maintenance of that living standard while Dr. Meaney incurred losses from his horse operation was made all the more acceptable to petitioners because of their reduced tax liability attributable to their claimed deduction of the losses. The foregoing circumstances cause factor eight to favor respondent. 9. The extent to which elements of personal pleasure or recreation are involved
Petitioners contend that Dr. Meaney's horse breeding and racing activities were not recreational in nature. They assert that although Dr. Meaney derived both pride and pleasure from those activities, his motivation for engaging in them was *131 to earn a profit. Respondent maintains that Dr. Meaney received the same pleasure from his horse breeding and racing activities as he received from the practice of medicine. It is clear that Dr. Meaney enjoyed his horse breeding and racing activities. Enjoyment of one's work, however, is not inconsistent with a profit motive. Bessenyey v. Commissioner, 45 T.C. 261, 275 (1965), affd. 379 F.2d 252 (2d Cir. 1967). The quantity of menial labor performed by Dr. Meaney negates the possibility that the venture was purely recreational in nature. However, hard work alone does not necessarily distinguish a hobby from a for-profit activity. Under the foregoing facts and circumstances, factor nine is neutral. C. Conclusion
Based on our consideration of all the facts and circumstances disclosed in the record, we hold that petitioners have not demonstrated that Dr. Meaney's standardbred horse breeding and racing operation was an activity engaged in for profit within the meaning of section 183. In reaching this conclusion, we were particularly influenced by the consistent history of losses from that operation and the lack of *132 evidence in the record showing that either before or during his conduct of that operation Dr. Meaney investigated or evaluated the factors affecting the profitability of such an operation, developed profit plans or break-even analyses, or consulted experts on how to make his operation profitable. Petitioners' failure to establish these facts could well be explained by their lack of concern over them, since they had more than sufficient income, especially taking account of the tax savings generated by the losses incurred from Dr. Meaney's horse breeding and racing activities, to absorb those losses without affecting their standard of living. Accordingly, on the instant record, the deductions relating to Dr. Meaney's horse operation that petitioners claimed for 1987, 1988, and 1989 are limited by section 183(a) and (b). II. Additions to Tax and Accuracy-Related Penalty -- Sections 6661 and 6662
Respondent determined that petitioners are liable for the addition to tax under section 6661 for 1987 and 1988 and for the accuracy-related penalty under section 6662 for 1989 as a result of a substantial understatement of income tax for each of those years. For 1987 and 1988, if *133 there is a substantial understatement of income tax, section 6661(a) imposes an addition to tax equal to 25 percent of the underpayment attributable to the understatement. For 1989, section 6662(a) imposes an accuracy-related penalty equal to 20 percent of the underpayment attributable to, among other things, any substantial understatement of income tax. Since the requirements for imposition of the addition to tax under section 6661(a) are substantially the same as the requirements for imposition of the accuracy-related penalty under section 6662(a), our discussion will focus on section 6661. However, it will apply equally to section 6662. An understatement exists where the amount of tax shown on the taxpayer's return is less than the amount required to be shown in his or her return. Sec. 6661(b)(2)(A); see also sec. 6662(d)(2)(A). In the case of individuals, an understatement is substantial where it exceeds the greater of $ 5,000 or 10 percent of the amount required to be shown on the taxpayer's return. Sec. 6661(b)(1)(A); see also sec. 6662(d)(1)(A). Excepting items attributable to tax shelters, the amount of the understatement is reduced by items with respect to which the *134 taxpayer had substantial authority for his or her position or for which relevant facts affecting tax treatment were adequately disclosed. [4] Sec. 6661(b)(2)(B); see also sec. 6662(d)(2)(B) and (C). Petitioners argue that they are not liable for the addition to tax under section 6661 or the accuracy-related penalty under section 6662 because the facts and circumstances relating to Dr. Meaney's horse breeding and racing activities establish that he engaged in those activities for profit. We construe this argument to mean that petitioners contend that they had substantial authority for their treatment of the losses resulting from those activities. In order to satisfy the substantial *135 authority standard of section 6661(b)(2)(B)(i), petitioners must show that the weight of authorities supporting their position is substantial in relation to those supporting a contrary position. Antonides v. Commissioner, 91 T.C. 686, 702 (1988), affd. 893 F.2d 656 (4th Cir. 1990); see also sec. 6662(d)(2)(B)(i). Although the standard is less stringent than the "more likely than not" standard, it is stricter than the "reasonable basis" standard that usually is sufficient to prevent imposition of the addition to tax for negligence. Sec. 1.6661-3(a)(2), Income Tax Regs; see also sec. 1.6662-4(d)(2), Income Tax Regs. The substantial authority standard is not so stringent that a taxpayer's treatment must be one that is ultimately upheld in litigation or that has a greater than 50-percent likelihood of being sustained in litigation. Sec. 1.6661-3(a)(2), Income Tax Regs.; see also sec. 1.6662-4(d)(2), Income Tax Regs. A taxpayer may have substantial authority for a position even where it is supported only by a well-reasoned construction of the pertinent statutory provision as applied to the relevant facts. Sec. 1.6661-3(b)(3), *136 Income Tax Regs; see also sec. 1.6662-4(d)(3)(ii), Income Tax Regs. There may be substantial authority for more than one position with respect to the same item. Sec. 1.6661-3(b)(1), Income Tax Regs; see also sec. 1.6662-4(d)(3)(i), Income Tax Regs.
The question whether the requisite profit objective exists is not resolved by merely counting the number of factors that support each party's position. Dunn v. Commissioner, supra; sec. 1.183-2(b), Income Tax Regs. It is decided by considering all the facts and circumstances, Hulter v. Commissioner, 91 T.C. at 393, with more weight being given to objective facts than to the taxpayer's statement of his or her intent, Dreicer v. Commissioner, 78 T.C. at 645. Although, in the instant case, a few of the factors that have been relied on by the courts and by the regulations under section 183 to show a profit motive are present, based on the entire record, we find that a well-reasoned construction of the pertinent cases and statutory and regulatory provisions as applied to all the facts and circumstances surrounding Dr. Meaney's horse operation *137 would not have enabled petitioners to conclude that Dr. Meaney had the requisite profit objective within the meaning of section 183 that would have allowed them to claim on their returns for the years at issue all the deductions related to that operation. We hold that petitioners did not have substantial authority in the instant case for their tax return position. Accordingly, petitioners are liable for the additions to tax under section 6661(a) for 1987 and 1988 and the accuracy-related penalty under 6662(a) for 1989. To reflect the foregoing and the concessions of the parties, Decision will be entered under Rule 155. Footnotes
1. All section references are to the Internal Revenue Code in effect for the years at issue. All Rule references are to the Tax Court Rules of Practice and Procedure.↩
2. It is not clear from the record whether both petitioners or only petitioner Thomas F. Meaney (Dr. Meaney) engaged in the horse breeding and racing activities. Although Dr. Meaney testified at trial, petitioner Mary R. Meaney did not. We shall treat the horse breeding and racing activities as involving only Dr. Meaney because the Schedules F filed with petitioners' Federal income tax returns for the years at issue and most of the records relating to those activities so indicate. The parties have stipulated that if the Court holds for petitioners on this issue, the losses claimed on Schedule F of their Federal income tax returns for 1987, 1988, and 1989 in the amounts of $ 36,239, $ 48,717, and $ 35,518, respectively, are to be allowed in full.↩
3. For example, Dr. Meaney's records that were introduced into evidence are silent as to when or for how much he purchased his interest in General Fund. Nor do they disclose whether Foxy Christine and Impetuous, two horses in which Dr. Meaney owned an interest, were successful racehorses, or when he sold his interest in Foxy Christine, or for how much Dr. Meaney sold his interest in those two horses. In addition, the records of Dr. Meaney that are in evidence do not disclose the sales prices for Music Show or Shade of Chris, and are unclear as to when, or if, and for how much Dr. Meaney sold his interest in Melsapoppin, Mean A Poppin, Mean Chris, and Undisputed. The records also do not show when and for how much he sold his interest in B Anne. Nor do the records maintained by the USTA that were introduced into evidence reflect that information.↩
4. Petitioners do not argue that adequate disclosure was made in their returns for 1987, 1988, and 1989 of any of the items comprising the understatement of tax for those years. We conclude therefore that petitioners concede that they did not make the adequate disclosure that would have shielded them from liability under secs. 6661 or 6662.↩