T.C. Summary Opinion 2013-58

UNITED STATES TAX COURT

GREGORY K. CRAIG AND ALETHA A. CRAIG, Petitioners v.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 9638-12S.                    Filed July 22, 2013.

Aletha A. Craig, pro se.

Rebecca J. Sable, for respondent.

SUMMARY OPINION

CHIECHI, Judge: This case was heard pursuant to the provisions of section

7463 of the Internal Revenue Code in effect when the petition was filed.[1] Pursu-

---

[1]Hereinafter, all section references are to the Internal Revenue Code (Code) in effect for the years at issue. All Rule references are to the Tax Court Rules of Practice and Procedure.

ant to section 7463(b), the decision to be entered is not reviewable by any other court, and this opinion shall not be treated as precedent for any other case.

Respondent determined deficiencies of $3,550 and $3,131 in, and accuracy-related penalties under section 6662(a) of $710 and $626.20 on, petitioners' Federal income tax (tax) for their taxable years 2008 and 2009, respectively.

The issues remaining for decision are:

(1) Did petitioner Aletha A. Craig engage in her horse activity during each of the years at issue with the objective of making a profit within the meaning of section 183? We hold that she did not.

(2) Is petitioner Aletha A. Craig liable for each of the years at issue for the accuracy-related penalty under section 6662(a)? We hold that she is.

Background

Petitioner Aletha A. Craig (Ms. Craig) and respondent stipulated some of the facts in this case, and those facts are so found.[2]

At the time petitioners filed the petition, they resided in Virginia.

---

[2]Petitioner Gregory K. Craig (Mr. Craig) did not sign the stipulation of facts between respondent and Ms. Craig, the supplemental stipulation of facts between respondent and Ms. Craig, or the stipulation of settled issues between respondent and Ms. Craig. Mr. Craig did not appear at the trial in this case, and respondent filed a motion to dismiss for lack of prosecution as to him. We shall grant that motion and shall enter a decision with respect to Mr. Craig that is the same as the decision that we shall enter with respect to Ms. Craig.

At all relevant times, including during 2008 and 2009, the years at issue, Ms. Craig worked full time as a real estate agent and Mr. Craig worked full time at Lockheed Martin in Manassas, Virginia, as a so-called high voltage electrician engineer.

As of the time of the trial in this case, Ms. Craig had been a real estate agent for approximately 12 years. During six of those years, Ms. Craig worked for a builder and spent her time marketing and selling newly constructed houses that the builder had constructed in the geographical area in which she lived. For at least each of the years 2005 through 2007, Ms. Craig had a profit from her real estate agent activity.

As of the time of the trial in this case, Ms. Craig had owned a rental property for about five years. She reported a profit from that rental property for at least one of those years.

During 2009, Ms. Craig also worked part time at H&R Block under the supervision of a manager. H&R Block provided training to Ms. Craig, including classes, when she worked for that company.

Before 2005, Ms. Craig's interest in horses was limited strictly to riding them and studying, researching, and reading about them. Ms. Craig, who grew up among farms, started riding horses at a young age and developed a love of horses

as a child.[3]  Ms. Craig's lifetime love of and interest in horses extended beyond riding.  She worked on several school projects on various horses and different breeds.  She read books, did research, including online research about horses and the different breeds of horses, attended certain expositions in different geographic areas on different horse breeds, and was involved with certain horse activities of 4-H organizations.  She also discussed with friends and acquaintances who owned horses their respective experiences with their horses and different horse-related topics.

In January 2002, petitioners purchased approximately 10 acres of farm property in Front Royal, Virginia.  Petitioners' daughter began riding when she was seven years old.  She took riding lessons and showed horses in certain English-style horse competitions.[4]

On November 11, 2004, at one of the competitions in which petitioners' daughter was competing, petitioners purchased for $3,000 their first horse, a so-

[3]After graduating from high school, Ms. Craig started college in a nursing program but did not finish that program.

[4]Petitioners' daughter has ridden horses in certain 4-H competitions, which increased the visibility of the horses that petitioners acquired (discussed below). However, the horses ridden in those competitions did not earn merit points that would have increased their value as is the case in international horse shows.

called Paint horse named Spooks Snow Chief (Chief), and built a horse stall for Chief.[5]

In 2004, petitioners also prepared the land on which their personal residence was located by, inter alia, clearing five acres of the approximately 10 acres of farm property that they had purchased in January 2002,[6] building a fence, including different paddocks, installing electric fencing on two paddocks, and building a barn or horse stable with two stalls. Part of the barn was used as a garage in which tractors, tractor implements, tools, and the like were stored.

In addition to Chief acquired in 2004, petitioners acquired seven horses, three in 2005, two in 2007, and two in 2010. The names of all of the horses that petitioners had owned as of the time of the trial in this case and certain pertinent information regarding those horses are shown below:

---

[5]Ms. Craig is particularly interested in the so-called Paint breed of horses.

[6]The remaining five acres consist of a wooded area on which petitioners had made no improvements as of the time of the trial in this case.

| Name | Acquisition Date | Acquisition Price | Disposition Date | Type of Horse |
|------|------------------|-------------------|------------------|---------------|
| Spooks Snow Chief | 11/11/2004 | $3,000 | -- | Medicine Hat Paint gelding |
| BBR Rysketta Doc | 2/10/2005[1] | 1,650 | -- | Perlino Paint mare |
| Riskey's Brave Spirit | 3/19/2005[2] | -0- | -- | Paint stallion |
| Versus Up In Smoke-Buckey | 11/12/2005 | 950 | -- | Tobiano Paint stallion |
| Graham Cracker | 6/2/2007 | -0- | ([3]) | Registered Miniature stallion |
| Fancey | 6/2/2007 | -0- | 11/19/2010[4] | Paint gelding |
| Fannie | 11/19/2010[5] | [6]800 | 12/21/2011[7] | Quarter Paint mare |
| J Bow | 12/2010 | -0- | -- | Paint gelding |

[1]BBR Rysketta Doc was pregnant when petitioners acquired her.
[2]BBR Rysketta Doc gave birth to a horse that petitioners named Riskey's Brave Spirit. See supra note 1.
[3]Petitioners gave away Graham Cracker on a date not established by the record.
[4]Petitioners exchanged Fancey for a horse named Fannie.
[5]See supra note 4.
[6]In addition to exchanging Fancey for Fannie, petitioners paid $800 for Fannie. See supra note 4.
[7]Petitioners received $1,100 when they disposed of Fannie.

In considering acquiring the horses listed above, Ms. Craig consulted with a friend, a horse trainer, certain 4-H members, and certain local horse breeding specialists.

Since acquiring the three stallions and the three geldings (listed above), Ms. Craig has exercised and ridden all of them on a regular basis. Petitioners' daugh-

ter also has ridden one of the geldings on a regular basis, and their son has ridden another gelding from time to time. As of the time of the trial in this case, Ms. Craig did not intend to sell the one mare, the three stallions, and one of the three geldings that petitioners owned.

At all relevant times, including during the years at issue, most of Ms. Craig's horse activity was conducted by Ms. Craig with occasional help from Mr. Craig and their two minor children. At all relevant times, including during the years at issue, Ms. Craig spent on the average 25 to 30 hours a week working in her horse activity and 25 to 40 hours a week working as a real estate agent.

At all relevant times, including during the years at issue, Ms. Craig did not keep a separate bank account for her horse activity. Instead, she paid expenses relating to that activity from petitioners' and/or her personal bank accounts.

At all relevant times, including during the years at issue, Ms. Craig did not have a written budget for her horse activity. Nor did she have at those times a written business plan that projected, for example, gross receipts and expenses from her horse activity. At all relevant times, including during the years at issue, Ms. Craig did not seek any advice or retain anyone to assist her in determining how to maintain records for her horse activity in a businesslike fashion.

During the years at issue, Ms. Craig incurred various expenses in her horse activity that included expenses for hay and other feed, fence and barn supplies, veterinary costs, boarding and training horses, farrier costs, transportation costs, insurance premiums, and personal property taxes.

At all relevant times, including during the years at issue, Ms. Craig maintained a horse activity ledger that she prepared at the end of each month in which she recorded the monthly expenses incurred in that activity. In preparing that ledger, Ms. Craig reviewed petitioners' and/or her personal checking account statements and separated the checks relating to her horse activity from the other checks.

In August 2010, respondent commenced an examination of petitioners' taxable years 2008 and 2009. Although at all relevant times, including during the years at issue, Ms. Craig did not have a written business plan for her horse activity, Ms. Craig drafted after respondent's examination began and provided to respondent on February 28, 2011, a written business plan (Ms. Craig's business plan) and a horse activity log (Ms. Craig's horse activity log). That business plan stated:

1. Finish installing the automatic waters and get electric to the barn.

2.  Finish interior walls, stalls, tack room, feed storogage, and electric in barn.
3.  Find pasture to rent for feeding to cut the current cost of supplementing w/hay year round.
4.  To bred stallion Buckey to mare Ritz for a foal in 2012.
5.  To take Buckey to a couple of shows to earn points but mainly for advertisement.
6.  Finish training Stallion Spirit for handling.
7.  Advertise Bucky & Spirit as studs for $500.$^{00}$ per breeding.
8.  Perfer to have them collected by the vet and send frozen sperm to client to artifically insiminate their mares.  This saves me the liability issues of caring for their mares during the breeding process.
9.  Looking for another good paint mare for breeding to Spirit for another foal in 2012.
10.  These foals will be offered for sale at birth for the day they are weaned.  [Reproduced literally.]

Since Ms. Craig prepared Ms. Craig's business plan around the end of February 2011 until the time of the trial in this case at the end of November 2012, Ms. Craig had not started and/or completed any of the items that she listed in that plan except item 6.

According to Ms. Craig's horse activity log, Ms. Craig's work on her horse activity during the years at issue included cleaning stalls, feeding horses, cleaning water troughs, handling animals for the farrier and for the veterinarian, grooming horses, exercising horses, and buying and transporting hay and other supplies.

Since 2005 until the time of the trial in this case, Ms. Craig had not in any way modified her horse activity or taken any action in order to increase the likelihood that that activity would be profitable.

At all relevant times, including during the years at issue, petitioners were aware that by claiming Ms. Craig's horse activity as an activity in Schedule F, Profit or Loss From Farming (Schedule F), they would, and did, receive a tax benefit.

The first tax return (return) in which petitioners reported Ms. Craig's horse activity as an activity from farming in Schedule F is their amended return for their taxable year 2005 that they filed in 2007.

Petitioners timely filed Form 1040, U.S. Individual Income Tax Return (Form 1040), for their taxable year 2008 (2008 return). Petitioners submitted Form 1040X, Amended U.S. Individual Income Tax Return, for that year, which respondent did not process. Petitioners included with their 2008 return Schedule F with respect to Ms. Craig's horse activity, in which they reported that they had no gross income and total expenses and a loss of $11,787 for their taxable year 2008. Petitioners also reported in their 2008 return that they had "Wages, salaries, tips, etc." of $71,506, "Taxable interest" of $601, "Ordinary dividends" of $6, "Taxable refunds, credits, or offsets of state and local income taxes" of $125, "Business

income or (loss)" of ($28,700) from Schedule C, Profit or Loss From Business (Schedule C), "Rental real estate, royalties, partnerships, S corporations, trusts, etc." of ($6,412) from Schedule E, Supplemental Income and Loss (Schedule E), and "total income" of $25,339 for their taxable year 2008.

Petitioners timely filed Form 1040 for their taxable year 2009 (2009 return). Petitioners included with their 2009 return Schedule F with respect to Ms. Craig's horse activity, in which they reported that they had no gross income and total expenses of $19,771[7] for their taxable year 2009. Petitioners also reported in their 2009 return that they had "Wages, salaries, tips, etc." of $73,743, "Taxable interest" of $297, "Ordinary dividends" of $7, "Business income or (loss)" of ($9,545) from Schedule C, "Rental real estate, royalties, partnerships, S corporations, trusts, etc." of ($11,525) from Schedule E, and "total income" of $42,978 for their taxable year 2009.[7]

Petitioners reported in their return for each of their taxable years 2005 through 2011 the following losses from Ms. Craig's horse activity which, except

[7]In computing "total income" in their 2009 return, petitioners claimed a "Farm income or (loss)" of only ($9,999) from Schedule F. For reasons not established by the record, they did not claim in computing that "total income" the expenses totaling $19,771 that they showed in Schedule F. As discussed below, respondent disallowed in the notice of deficiency only $9,999 of expenses claimed with respect to Ms. Craig's horse activity for petitioners' taxable year 2009.

for taxable year 2007, consisted entirely of the expenses that they claimed with respect to that activity for each of those years:

| Taxable Year | Gross Receipts | Expenses Claimed | Loss Claimed |
|---|---|---|---|
| 2005 | -0- | ($28,033) | ($28,033) |
| 2006 | -0- | (18,631) | (18,631) |
| 2007 | [1]$950 | (13,014) | (12,064) |
| 2008 | -0- | (11,787) | (11,787) |
| 2009 | -0- | [2](9,999) | [2](9,999) |
| 2010 | -0- | (19,330) | (19,330) |
| 2011 | -0- | (18,067) | (18,067) |

[1]Although Ms. Craig and respondent stipulated that petitioners had reported in petitioners' 2007 return gross receipts of $950 from her horse activity, at trial she testified that she believed the reporting of those gross receipts was an error.
[2]See supra text note 7.

Respondent issued a notice of deficiency (notice) to petitioners for their taxable years 2008 and 2009. In that notice, respondent determined, inter alia, to disallow respective farm expenses and losses of $11,787 and $9,999 from Schedules F with respect to Ms. Craig's horse activity that petitioners had claimed in their 2008 return and their 2009 return. Respondent also determined in the notice that petitioners are liable for each of their taxable years 2008 and 2009 for the accuracy-related penalty under section 6662(a).

Discussion

Ms. Craig bears the burden of proving that the determinations in the notice are erroneous.[8] See Rule 142(a); Welch v. Helvering, 290 U.S. 111, 115 (1933).

Section 183

Section 183(a) generally limits the amount of expenses that a taxpayer may deduct with respect to an activity "not engaged in for profit" to the deductions provided in section 183(b). Section 183(b)(1) provides that deductions that would be allowable without regard to whether such activity is engaged in for profit are to be allowed. Section 183(b)(2) further indicates that deductions which would be allowable only if such activity is engaged in for profit are to be allowed, but only to the extent that the gross income derived from such activity for the taxable year exceeds the deductions allowable under section 183(b)(1). An activity is "not engaged in for profit" if it is an activity other than one with respect to which deductions are allowable for the taxable year under section 162 or section 212(1) or (2). Sec. 183(c).

In the case of an activity which consists in major part of the breeding, training, showing, or racing of horses, if the gross income derived from such

_____

[8]Ms. Craig does not argue that under sec. 7491(a) the burden of proof has shifted to respondent with respect to the issue presented under sec. 183.

activity exceeds the deductions for any two of seven consecutive taxable years, the activity is presumed to be engaged in for profit for purposes of section 183 unless the Commissioner establishes to the contrary.  Sec. 183(d); sec. 1.183-1(c)(1), Income Tax Regs.  Because petitioners claimed losses for each of their taxable years 2005, when Ms. Craig began her horse activity, through 2011, the presumption under section 183(d) does not apply in the instant case.

In determining whether an activity is engaged in for profit for purposes of section 183, the taxpayer must show that he or she engaged in the activity with an actual and honest objective of making a profit.  E.g., Hulter v. Commissioner, 91 T.C. 371, 392 (1988); Dreicer v. Commissioner, 78 T.C. 642, 645 (1982), aff'd without opinion, 702 F.2d 1205 (D.C. Cir. 1983).  Although the taxpayer's expectation of a profit need not be reasonable, he or she must have a good faith objective of making a profit.  E.g., Dreicer v. Commissioner, supra; Dunn v. Commissioner, 70 T.C. 715, 720 (1978), aff'd on another issue, 615 F.2d 578 (2d Cir. 1980); sec. 1.183-2(a), Income Tax Regs.  The taxpayer bears the burden of proving the requisite intent.  E.g., Golanty v. Commissioner, 72 T.C. 411, 426 (1979), aff'd without published opinion, 647 F.2d 170 (9th Cir. 1981); Johnson v. Commissioner, 59 T.C. 791, 814 (1973), aff'd, 495 F.2d 1079 (6th Cir. 1974); see Dreicer v. Commissioner, supra at 646.

Whether a taxpayer engaged in an activity with the requisite profit objective is determined from all the facts and circumstances. E.g., Hulter v. Commissioner, 91 T.C. at 393; Taube v. Commissioner, 88 T.C. 464, 480 (1987); Golanty v. Commissioner, 72 T.C. 411; sec. 1.183-2(a) and (b), Income Tax Regs. More weight is given to objective facts than to the taxpayer's mere statement of his or her intent. E.g., Dreicer v. Commissioner, 78 T.C. at 645; sec. 1.183-2(a), Income Tax Regs.

Section 1.183-2(b), Income Tax Regs., lists the following nine factors that should normally be taken into account in determining whether an activity is engaged in for profit: (1) the manner in which the taxpayer carried on the activity, (2) the expertise of the taxpayer or his advisors, (3) the time and effort expended by the taxpayer in carrying on the activity, (4) the expectation that assets used in the activity may appreciate in value, (5) the success of the taxpayer in carrying on other similar or dissimilar activities, (6) the taxpayer's history of income or loss with respect to the activity, (7) the amount of occasional profit, if any, which is earned, (8) the financial status of the taxpayer, and (9) the extent to which elements of personal pleasure or recreation are involved. The list of factors in the regulations is not exclusive, and other factors may be considered in determining whether an activity is engaged in for profit. No single factor is dispositive. E.g.,

Golanty v. Commissioner, 72 T.C. at 426; sec. 1.183-2(b), Income Tax Regs. The determination of a profit objective does not depend on counting the number of factors that support each party's position. E.g., Dunn v. Commissioner, 70 T.C. 715; sec. 1.183-2(b), Income Tax Regs.

Because the parties argue their respective positions by addressing each of the factors listed in the regulations under section 183, we shall follow the same approach here.

### Manner in which Ms. Craig carried on her horse activity

At all relevant times, including during the years at issue, Ms. Craig did not keep a bank account for her horse activity. Instead, she paid expenses relating to that activity from petitioners' and/or her personal bank accounts.

At all relevant times, including during the years at issue, Ms. Craig did not have a written budget for her horse activity. Nor did she have at those times a written business plan that projected, for example, gross receipts and expenses from her horse activity.

At all relevant times, including during the years at issue, Ms. Craig did not seek any advice or retain anyone to assist her in determining how to maintain records for her horse activity in a businesslike fashion.

About six months after respondent's examination of petitioners' taxable years 2008 and 2009 began, Ms. Craig drafted and provided to respondent on February 28, 2011, a written business plan and a horse activity log. Since Ms. Craig prepared Ms. Craig's business plan around the end of February 2011, until the time of the trial in this case at the end of November 2012, Ms. Craig had not started and/or completed any of the items that she listed in that plan.

Since 2005, when Ms. Craig commenced her horse activity, until the time of the trial in this case, she had not in any way modified that activity or taken any action in order to increase the likelihood that her horse activity would be profitable.

On the instant record, we find that factor (1) in section 1.183-2(b), Income Tax Regs., does not support Ms. Craig's position that she engaged in her horse activity with an actual and honest objective of making a profit.

Expertise of Ms. Craig or her advisors

Before 2005, Ms. Craig's interest in horses was limited strictly to riding them and studying, researching, and reading about them. Ms. Craig, who grew up among farms, started riding horses at a young age and developed a love of horses as a child. Ms. Craig's lifetime love of and interest in horses extended beyond riding. She worked on several school projects on various horses and different

breeds.  She read books, did research, including online research about horses and the different breeds of horses, attended certain expositions in different geographic areas on different horse breeds, and was involved with certain horse activities of 4-H organizations.  She also discussed with friends and acquaintances who owned horses their respective experiences with their horses and different horse-related topics.

We found Ms. Craig's testimony regarding her reading and research about horses, her attendance at certain horse expositions and certain 4-H horse activities, and her discussions with friends and acquaintances who owned horses of their respective experiences with their horses and different horse-related topics to be general, vague, and/or conclusory.  We do not know from Ms. Craig's testimony or otherwise from the record the specifics of the research, if any, that she has done on horse breeding, the specifics of the advice, if any, that she has received about horse breeding, or what, if anything, she has done to apply any such research and any such advice in her alleged horse-breeding activity in an effort to make that activity profitable.

Moreover, the record does not establish that Ms. Craig ever attempted to breed any of the two mares or the three stallions that petitioners acquired over the

period 2005 through 2010. Nor does the record establish why petitioners acquired three geldings which obviously cannot be used to breed.

On the instant record, we find that factor (2) in section 1.183-2(b), Income Tax Regs., does not support Ms. Craig's position that she engaged in her horse activity with an actual and honest objective of making a profit.

Time and effort expended by Ms. Craig

During 2008 and 2009, the years at issue, Ms. Craig worked full time as a real estate agent, and Mr. Craig worked full time at Lockheed Martin as a so-called high voltage electrician engineer. During 2009, Ms. Craig also worked part time at H&R Block under the supervision of a manager.

At all relevant times, including during the years at issue, most of Ms. Craig's horse activity was conducted by Ms. Craig with occasional help from Mr. Craig and their two minor children. At those times, Ms. Craig spent on the average 25 to 30 hours a week working in her horse activity[9] and 25 to 40 hours a

---

[9]According to Ms. Craig's horse activity log, Ms. Craig's work on her horse activity during the years at issue included cleaning stalls, feeding horses, cleaning water troughs, handling animals for the farrier and for the veterinarian, grooming horses, exercising horses, and buying and transporting hay and other supplies.

week working as a real estate agent.[10]  Although at all relevant times, including during the years at issue, Ms. Craig spent a substantial amount of time each week working in her horse activity, we believe that that time spent in her horse activity is totally consistent with her lifetime love of and interest in horses.

On the instant record, we find that factor (3) in section 1.183-2(b), Income Tax Regs., does not support Ms. Craig's position that she engaged in her horse activity with an actual and honest objective of making a profit.

Expectation that the assets used in the activity may appreciate in value

Ms. Craig asserts on brief that she "expects the value of her horses to appreciate as a result of the training, breeding and show competition reputation developed by her horses" and "also expects the value of her real property and related improvements to increase as the result of her development of a reputation as a primary supplier of 'Paint' horses."

Ms. Craig has not established through her testimony, and the record does not otherwise establish, that the increase, if any, in the value of petitioners' horses and the increase, if any, in the value of petitioners' farm property and improvements thereon would exceed the expenses that she has incurred in carrying on her

---

[10]The record does not establish that Ms. Craig materially withdrew from her activity as a real estate agent during the period she was engaged in her horse activity.

horse activity since 2005 and would be sufficient to recoup the aggregate losses sustained in that activity since that year.

On the instant record, we find that factor (4) in section 1.183-2(b), Income Tax Regs., does not support Ms. Craig's position that she engaged in her horse activity with an actual and honest objective of making a profit.

Success of Ms. Craig in carrying on other similar or dissimilar activities

Ms. Craig has not engaged in any activities similar to her horse activity. However, as of the time of the trial in this case, Ms. Craig had been a real estate agent for approximately 12 years. During six of those years, Ms. Craig worked for a builder and spent her time marketing and selling newly constructed houses that the builder had constructed in the geographical area in which she lived. For at least each of the years 2005 through 2007, Ms. Craig had a profit from her real estate agent activity.

Moreover, as of the time of the trial in this case, Ms. Craig had owned a rental property for about five years. She reported a profit from that rental property for at least one of those years.

Ms. Craig asks the Court to conclude that, because of her success as a real estate agent,[11] she has "the potential for success in other fields." Although we agree that Ms. Craig has been a successful real estate agent, we are unable on the record before us to make the leap that would be required for us to conclude that her abilities and skills as a successful real estate agent would be helpful in her claimed horse-breeding activity.[12]

On the instant record, we find that factor (5) in section 1.183-2(b), Income Tax Regs., does not support Ms. Craig's position that she engaged in her horse activity with an actual and honest objective of making a profit.

Ms. Craig's history of income or loss with respect to the activity

Except for taxable year 2007, petitioners did not report any income from Ms. Craig's horse activity for taxable years 2005 through 2011. For taxable year 2007, petitioners reported $950 from the sale of livestock.

_____

[11]According to petitioner, the real estate agent activity "basically died, came to a stop, business came to a stop" because of "the recession". We presume Ms. Craig was referring in her testimony to the downturn in the economy that occurred starting around late 2008 and early 2009, of which we take judicial notice. However, the record does not establish the exact timeframe to which Ms. Craig was referring when she used the phrase "the recession".

[12]We note that the record does not establish that since 2005, when Ms. Craig began her horse activity, until the time of the trial in this case she had in any way modified her horse activity or taken any action in order to increase the likelihood that that activity would be profitable.

Ms. Craig does not claim that the losses sustained for each of petitioners' taxable years 2005 through 2011 were due to any unforeseen or fortuitous circumstances beyond her control. Moreover, as noted above, since 2005, when Ms. Craig began her horse activity, until the time of the trial in this case, she had not in any way modified her horse activity or taken any action to increase the likelihood that that activity would be profitable.

On the instant record, we find that factor (6) in section 1.183-2(b), Income Tax Regs., does not support Ms. Craig's position that she engaged in her horse activity with an actual and honest objective of making a profit.

Amount of occasional profit, if any

Ms. Craig has never generated a profit from her horse activity. In fact, except for taxable year 2007 in which petitioners reported in Schedule F gross receipts of $950 from the sale of livestock, petitioners have not reported any gross receipts for their taxable years 2005 through 2011.

On the instant record, we find that factor (7) in section 1.183-2(b), Income Tax Regs., does not support Ms. Craig's position that she engaged in her horse activity with an actual and honest objective of making a profit.

Financial status of Ms. Craig

Virtually all of the income that petitioners reported in their 2008 return and their 2009 return, as well as in their 2005 amended return and their returns for their taxable years 2006, 2007, 2010, and 2011, was attributable to Ms. Craig's work as a real estate agent and Mr. Craig's work as an electrician for Lockheed Martin. That income was in part offset by the respective losses that they reported in Schedules F included with those returns.

On the instant record, we find that factor (8) in section 1.183-2(b), Income Tax Regs., does not support Ms. Craig's position that she engaged in her horse activity with an actual and honest objective of making a profit.

Extent to which elements of personal pleasure or recreation are involved

Ms. Craig, who grew up among farms, started riding horses at a young age and developed a love of horses as a child. Her lifetime love of and interest in horses extended beyond riding. She worked on school projects on various horses and different breeds. Ms. Craig read books, did research, including online research about horses and the different breeds of horses, attended certain expositions in different geographic areas on different horse breeds, and was involved with certain horse activities of 4-H organizations. Both of petitioners' children began riding at young ages.

On the record before us, we find that the extensive time that Ms. Craig spent and, to a lesser extent, her children and Mr. Craig spent in Ms. Craig's horse activity, such as cleaning horses, stalls, and water troughs, exercising the horses, and buying and transporting hay and other supplies, is not inconsistent with Ms. Craig's lifetime love of and interest in horses.

On the instant record, we find that factor (9) in section 1.183-2(b), Income Tax Regs., does not support Ms. Craig's position that she engaged in her horse activity with an actual and honest objective of making a profit.

The record does not establish any other factors that support Ms. Craig's position that she engaged in her horse activity with an actual and honest objective of making a profit.

Based upon our examination of the entire record before us, we find that Ms. Craig has failed to carry her burden of establishing that she engaged in her horse activity with the objective of making a profit within the meaning of section 183.

Section 6662(a)

Section 6662(a) imposes an accuracy-related penalty of 20 percent of the underpayment to which section 6662 applies. Section 6662 applies to the portion of any underpayment which is attributable to, inter alia, negligence or disregard of rules or regulations. Sec. 6662(b)(1). Respondent argues that petitioners are

liable for the accuracy-related penalty under section 6662(a) because of negligence or disregard of rules or regulations under section 6662(b)(1).

The term "negligence" in section 6662(b)(1) includes any failure to make a reasonable attempt to comply with the Code. Sec. 6662(c). Negligence has also been defined as a failure to do what a reasonable person would do under the circumstances. Leuhsler v. Commissioner, 963 F.2d 907, 910 (6th Cir. 1992), aff'g T.C. Memo. 1991-179; Antonides v. Commissioner, 91 T.C. 686, 699 (1988), aff'd, 893 F.2d 656 (4th Cir. 1990). The term "negligence" also includes any failure by the taxpayer to keep adequate books and records or to substantiate items properly. Sec. 1.6662-3(b)(1), Income Tax Regs. The term "disregard" includes any careless, reckless, or intentional disregard. Sec. 6662(c).

The accuracy-related penalty under section 6662(a) does not apply to any portion of an underpayment if it is shown that there was reasonable cause for, and that the taxpayer acted in good faith with respect to, such portion. Sec. 6664(c)(1). The determination of whether the taxpayer acted with reasonable cause and in good faith depends on all the pertinent facts and circumstances, including the taxpayer's efforts to assess the taxpayer's proper tax liability, the knowledge and experience of the taxpayer, and the taxpayer's reliance on the

advice of a professional, such as an accountant. Sec. 1.6664-4(b)(1), Income Tax Regs.

On the instant record, we find that since Ms. Craig began her horse activity in 2005 she has not undertaken to do with respect to that activity what a reasonable person, who has an actual and honest objective of making a profit from that activity, would have done. On that record, we further find that respondent has carried respondent's burden of production under section 7491(c).

On the instant record, we find that Ms. Craig has failed to carry her burden of showing that she acted with reasonable cause and in good faith to assess whether petitioners should claim for each of their taxable years 2008 and 2009 her horse activity as an activity in Schedule F with respect to which she had the objective of making a profit within the meaning of section 183. See sec. 6664(c)(1); sec. 1.6664-4(b)(1), Income Tax Regs.

Based upon our examination of the entire record before us, we find that Ms. Craig has failed to carry her burden of establishing that she is not liable for each of the years at issue for the accuracy-related penalty under section 6662(a).

We have considered all of Ms. Craig's contentions and arguments that are not discussed herein, and we find them to be without merit, irrelevant, and/or moot.

To reflect the foregoing and respondent's concession set forth in the stipulation of settled issues between respondent and Ms. Craig,

<u>An order granting respondent's motion to dismiss for lack of prosecution as to petitioner Gregory K. Craig and decision under Rule 155 will be entered</u>.